[Crim. No. 3889.   Third Dist.   July 11, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JIMMIE GARRISON, Defendant and Appellant.

Nathaniel S. Colley, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Raymond M. Momboisse and Nelson P. Kempsky, Deputy Attorneys General, for Plaintiff and Respondent.

PIERCE, P. J.—This appeal has been before this court and once decided April 21, 1966, in an opinion certified for nonpublication. By that opinion we affirmed as to each defendant-appellant (Jimmie Garrison and Raymond Belcher) a second degree burglary conviction following a jury conviction. Hearing was denied by the California Supreme Court. After *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], a petition by defendant Jimmie Garrison[1] to the United States Supreme Court for certiorari was granted. As to Garrison the judgment was vacated and the case remanded to this court for further consideration in the light of the *Chapman* case. This we have done. We have not changed our conclusion that error resulting from a violation of the rule in *Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] (decided after the trial) was not prejudicial.

Because the previous opinion was not published we will

---

[1] Defendant Raymond Belcher did not petition. The judgment as to him is final. The point involved in the *Chapman* case would be inapplicable to Belcher any way because he was a witness at the trial.

restate (with some amplification) the facts contained therein. Only those contentions affecting defendant JIMMIE GARRISON will be discussed.

On Monday, January 4, 1965, at 12:45 a.m., two police officers in a squad car noticed the two defendants at a closed service station and stopped to investigate. The lock to the gate of the station's "lube" room had been broken and the gate was open. Belcher, inside the "lube" room, tried to hide. Garrison, just outside the building, started to walk away. He was stopped and the officers questioned both defendants. Each denied acquaintance with the other. Garrison said he had been at a nearby bar, had taken a friend home and was returning in his car to the bar. He declared he had left his car to relieve himself. He pointed to a Pontiac automobile across the street and said it was his. The officers examined the car, discovered its engine was cold and that it was not registered to Garrison. No keys were in the ignition switch and Garrison said he did not know where they were. Belcher, when questioned, also told the officers he had gone into the service station to urinate. When accosted Garrison was wearing gloves. Belcher was observed dropping something in the "lube" room at a point where the officers discovered another pair of gloves. These were cotton gloves.

The owner of the service station who had been called to the scene arrived. A Cadillac automobile across the street was observed from the outside. The door on the driver's side was partly open. Keys were observed in the ignition keyhole. The registration certificate showed the car to be registered to Garrison. A crowbar and a tire iron were seen with the aid of a flashlight on the back floorboard. The trunk, which was slightly ajar, was opened and other tools positively identified by the service station owner as belonging to him were found.

Defendants were taken to the police station. There both were advised of their right to remain silent and of their right to counsel. Neither made incriminating statements.

Garrison did not testify.[2] Belcher took the stand in his own defense. He repeated his previous statement to the police that he had gone into the service station looking for a rest room at which to relieve himself. The prosecution in addition to proving the circumstances related above also proved that Belcher and Garrison had been fellow inmates at Folsom and at other California prisons.

---

[2]Garrison refused an attorney; handled his own defense.

RE THE CONTENTION THAT IT WAS PREJUDICIAL
ERROR TO PERMIT EVIDENCE OF PRIOR CONVICTIONS.

Evidence that Belcher and Garrison had been prison inmates at the same time in several prisons and therefore probably knew each other was admissible to controvert the statements by both at the scene of the crime that they were unacquainted. Proof of other crimes, though inadmissible to show a propensity to commit crimes, may be admissible for other purposes when its probative value to establish a fact at issue outweighs its possible prejudicial effect, e.g., such evidence has been held properly received to prove absence of mistake or accident, motive, intent, common scheme, design, plan, or modus operandi, etc. (See *People* v. *Henderson,* 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Brommel,* 56 Cal.2d 629, 635 [15 Cal.Rptr. 909, 364 P.2d 845]; *People* v. *Combes,* 56 Cal.2d 135, 147 [14 Cal.Rptr. 4, 363 P.2d 4]; *People* v. *Peete,* 28 Cal.2d 306 [169 P.2d 924]; *People* v. *Claborn,* 224 Cal.App.2d 38, 44 [36 Cal.Rptr. 132].) While it has been said that such evidence must be received with caution, determination of admissibility is usually left to the trial court in the exercise of a sound discretion. (*People* v. *Henderson, supra.*) Under the circumstances related above, we hold the evidence of probable acquaintanceship of the two men, although it incidentally also showed criminal records, was admissible. (See *People* v. *Peete, supra,* 28 Cal.2d 306.)

RE THE CONTENTION THAT EVIDENCE OBTAINED BY AN
ILLEGAL SEARCH AND SEIZURE WAS ADMITTED
INTO EVIDENCE.

Defendant Garrison contends that the tools in the trunk of his automobile were obtained as the result of an illegal search and seizure. We do not sustain this contention. Garrison was observed and stopped while walking away from a service station which had obviously been illegally entered. He told a false story as to the identity of his automobile. Another car was ascertained to be his. Tools suitable for the commission of a burglary were observed without the necessity of a search. The search thereafter made was with probable cause. (*People* v. *Koelzer,* 222 Cal.App.2d 20 [34 Cal.Rptr. 718].)

RE THE CONTENTION THAT VIOLATION OF THE *Griffin*
RULE REQUIRES A REVERSAL.

The jury verdict in this case was returned on April 2,

1965. The prosecuting attorney in his argument commented upon the failure of Garrison to take the stand, and the court gave the then standard instruction regarding the inferences which the jury might draw from such failure. In *Griffin* v. *California, supra,* 380 U.S. 609, decided thereafter, such comment by a prosecutor and the same instruction as that given here were held to violate the Fifth Amendment of the United States Constitution. In *People* v. *Bostick,* 62 Cal.2d 820, 823 [44 Cal.Rptr. 649, 402 P.2d 529], our Supreme Court held the error was not prejudicial per se. A reversal is called for only when there has been a miscarriage of justice under California Constitution article VI, section 13. The rationale of the *Griffin* case is that comment substantially waters down the constitutional guaranty against testimonial compulsion because it extracts a substantial penalty for the exercise of the privilege.

In *Chapman* v. *California* (1967) 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 875 S.Ct. 824], the United States Supreme Court agreed with *Bostick,* saying that the prohibition was not ''so basic to a fair trial that its infraction can never be treated as harmless error.'' The court in *Chapman* recognized the validity of California's ''miscarriage of justice'' constitutional provision (art, VI, § 13) applied in a proper case and within a proper context. It did not agree, however, that the California courts' interpretation of the phrase gave to the accused enough protection. It selected instead the test of *Fahy* v. *Connecticut,* 375 U.S. 85 [11 L.Ed.2d 171, at page 173, 84 S.Ct. 229] : ''The question is whether there is a reasonable *possibility* that the evidence complained of might have contributed to the conviction.''[3] (Italics added.) The court in *Chapman* interpreted the *Fahy* test to equate with this: ''before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.'' (*Chapman* v. *California, supra,* 17 L.Ed.2d 705, 710-711.)　　　It is our belief that the error of comment by the trial court and prosecutor on the failure of Garrison to testify *was harmless* beyond a reasonable doubt. Determination of this question is reached by comparison

---

[3]We think it fair to state that the ''*Fahy* test'' was precisely that which this court applied when this case was initially before us. We stated therein: ''There is not the slightest possibility that a result more favorable to either defendant could have occurred even had there been no comment on Garrison's failure to testify and no instruction given . . .'' *Fahy* v. *Connecticut, supra,* 375 U.S. 85, 11 L.Ed.2d 171, was among the cases cited to support our statement.

under the *Fahy-Chapman* test of the strength of the competent evidence against the accused with the seriousness of the error committed.

First, we summarize the evidence already stated: Garrison was discovered late at night outside a closed service station which had been broken into. Notwithstanding a denial weighty circumstantial evidence pointed to acquaintanceship of Garrison with his codefendant who, inside the premises, tried to hide from the police officers. Garrison attempted to walk away. On a January night both had been wearing gloves. Burglars commonly wear gloves. One pair was cotton. That would be an unusual accoutrement for an ordinary person in winter. Garrison's explanation of his reason for being at the service station (to urinate), somewhat incredible under any circumstance, was more so because of his extrajudicial statement that his destination was a nearby bar. His attempt to decoy the officers away from his own later-discovered automobile by claiming ownership of a car not his was highly inculpatory. In his car were legally found (1) tools commonly used by burglars; (2) *other tools identified as belonging to the service station.* The italicized evidence we deem to establish guilt beyond a shadow of doubt.

We weigh against this the comment by the court and prosecutor disclosed by the record. The only comment by the judge was identical to that in *Griffin* v. *California, supra,* 380 U.S. 609, 14 L.Ed.2d 106. Apparently it was also identical to that in *Chapman,* although in *Chapman* (in footnote 2, at p. 708 of 17 L.Ed.2d) only a portion of the instruction is given. The instruction, as given, contains also cautionary material. It tells the jury that if a defendant does not have knowledge he would need to deny or explain, it would be unreasonable to draw an inference against him. It also informs that the failure to explain or deny does not create a presumption of guilt or by itself warrant an inference of guilt, nor does it relieve the prosecution of its burden (elsewhere explained) of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt. The court also instructed the jury the defendant "may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove every essential element of the charge," and it repeats the adjuration that "no lack of testimony on defendant's part will supply a failure of proof by the People" of every essential element of the crime charged. Also elsewhere the jury was instructed that if the evidence was susceptible of

two interpretations, each reasonable, one pointing to guilt, the other to innocence, it was the jury's duty under the law to adopt that interpretation which will admit of innocence, rejecting that of guilt.

The prosecutor made references in both his opening and closing arguments to Garrison's failure to testify. That portion of his opening argument coming within the scope of this discussion is set forth in the margin.[4]

---

[4] ". . . Although Mr. Garrison will argue for himself, nothing he says by the way is evidence, and nothing is sworn to, nothing that Mr. Garrison has said in these entire proceedings is sworn to: but if he had been sworn and if he had testified, wouldn't you liked to have known the answers to these questions: why he parked his automobile two blocks away from the Howdy Club if that was his destination? You recall on this diagram here he parked over here. Yet, the Howdy Club, according to the officer's testimony—and no one contradicted the officer—that it was a block away. No one contradicted the officer on that. Although the diagram looks like its closer than that, the officer testifies it's a block away. But even though, so why didn't he park over here somewhere or over here? Why down here? And he said he had come from the Howdy Club, he left—pardon me, the officer said he was told by Mr. Garrison he left the Howdy Club—— . . .

"MR. NOLAND: Second question I think you'd probably like to have answered to you is why didn't Mr. Garrison use the toilet at the Howdy Club instead if he was headed over there to come over there, why his very late explanation he was using the toilet? The toilets are on this side. He came from this side because his car was over there. What was he doing out there? Why didn't he use the toilet in the Howdy Club? . . .

"MR. NOLAND: I think another question I'd like to have the answer to is why if Mr. Belcher was a stranger to Mr. Garrison, why Mr. Garrison, why he wasn't a little bit alarmed by seeing someone inside this station? I'd like to reserve that point for argument a little bit later on. . . .

"MR. NOLAND: The third question I believe you'd like to know the answer to was why Mr. Garrison—what Mr. Garrison would say as to why he had misdirected the police officer over to the green Pontiac across Franklin Boulevard, which was at least 90 degrees if not more like 150 to 60 degrees in a different direction from his own car, which he later admitted was his car and the registration was found on the steering wheel? Why did he misdirect the officer? Isn't it reasonable to assume that he did so because he knew the burlgary tools and Mr. Shintaku's tools were in his Cadillac?

"The fourth unanswered question is why did he leave this pry bar and this other tool in the back of his car? What was the purpose for it? The purpose for the gloves? You might have liked to have known why he attempted to have you believe that there was a clock in the police car, that he found out the time from a clock in the police car. And then the officer had to correct him there was no clock in the police car at all. . . .

". . . . . . . . . . . . .
"If you will recall, I left the point of the Pontiac a little bit too soon. The question still unanswered as to why he misdirected the Pontiac and then when the officer came back over to the patrol car and Mr. Garrison and Belcher were sitting in it in custody in the back of the patrol car, and Officer Farnsworth said, 'The motor is cold. It's not registered to you. What's your explanation to that? And Mr. Garrison merely shrugged his shoulders, a type of course to prevent the officer from finding the Cadillac.

Of these statements it was, of course, not error for the prosecution to inform the jury that what Garrison would say during argument was not evidence. (Evid. Code, § 140; *Ritter* v. *Salsbery*, 142 Cal.App.2d Supp. 847, 854 [298 P.2d 166] (on denial of rehearing); *Mills* v. *Vista Pools, Inc.*, 184 Cal. App.2d 668, 672 [7 Cal.Rptr. 545]; *Haynes* v. *Hunt*, 208 Cal.App.2d 331, 335 [25 Cal.Rptr. 174]; *People* v. *Kinder*, 122 Cal.App.2d 457, 463-464 [265 P.2d 24].) Nor did the prosecutor transgress beyond the limits of permissible advocacy when he put the weaknesses of the defense in interrogative form. The error of this prosecutor's pre-*Griffin* argument was in couching his initial questions after an assumption: "if he [defendant] had been sworn and if he had testified" and in suggesting to the jury that explanation might have come from defendant's testimony.

Before we discuss the prosecution's closing argument reference should be made to Garrison's argument which can more accurately be described as a combination of argument and unsworn and uncross-examinable "testimony." In fact, Garrison told the jury: "So I elected to act as my own attorney, and that way I could bring to the attention of you jurors all the facts of the crime." Unsurprisingly, most of his argument was irrelevant. He, himself, made repeated reference to his refusal to testify.

The comment by the prosecuting attorney in his closing argument had to do with an answer to a defense argument (raised both by Garrison and Belcher) relating to a discrepancy in the testimony of the officers regarding the gloves. He said: "Its quite true police have a lot of other things on their minds. They sure do get confused on who had what pair of gloves. But there is no correction that both Defendants had gloves and Mr. Garrison didn't take the stand and say, 'I didn't have any gloves.' He didn't take the stand and say, 'I didn't have any burglary tools in my car.' He didn't take the stand and say, 'I didn't have that stolen merchandise in my car.'"

After *Chapman* our Supreme Court again had occasion to apply what we have termed the *Fahy-Chapman* test in *People* v. *Modesto* (May 1967) 66 Cal.2d 695 [59 Cal.Rptr. 124, 427 P.2d 788]. There the prosecution had admittedly "not only . . . [come] close to the *Griffin* line but [had] crossed

---

"Another question we are not able to ask him, of course, is does he know Mr. Belcher, Mr. Garrison, whether or not he's acquainted with Mr. Belcher."

it.'' (*Idem*, p. 710.) The court, quoting, stating (on p. 711) that ''the comment condemned in *Griffin* is not 'a magical incantation, the slightest deviation from which will break the spell.' '' It added that it was '' 'entitled to be appraised in terms of its net effect.' '' Again the court stated (on p. 712): '' [W]e need not reverse this conviction for the sole reason that we *might* be able to conceive of *some possibility,* however remote, that a jury *could* have been marginally influenced by the comment in question. The *Chapman* test is couched in terms of 'reasonable doubt' and . . . a reasonable doubt must be more than a 'possible' doubt, since complete certainty is unattainable in the affairs of men.'' The error in *Modesto* was deemed nonprejudicial.

As in *Modesto,* we have focused upon *''the extent to which the comment itself might have inreased the jury's inclination to treat the defendant's silence as an indication of his guilt.''* (*People* v. *Modesto, supra,* 66 Cal.2d 695, 713.)[5] As in *Modesto* and contrary to *Chapman* there was here no '' 'machine-gun repetition of a denial of constitutional rights, all designed and calculated to make [defendant's] version of the evidence worthless. . . .' [Citation.]'' (*People* v. *Modesto, supra,* p. 714.) In fact defendant seems to have had no coherent version of the evidence which could be said to point to his innocence.

Reasoning, therefore, which argues that but for the prosecution's comments the jury might have found Garrison not guilty also argues that jurors are children and our whole jury system childish. We refuse to adopt such sophistry. Although Garrison had talked both extrajudicially and in the court room via his objections, cross-examination of witnesses and ''argument,' he had not testified. His argument was not evidence. It was proper, if wholly unnecessary, for the prosecution so to inform the jury in argument. It was improper, but in the context of this case, entirely harmless to comment on his failure to testify.

After reconsideration, the judgment is affirmed.

Friedman, J., and Regan, J., concurred.

---

[5]In the instant case it must be noted, however, that defendant's ''silence'' was only testimonial silence. Via his argument he was quite garrulous and throughout the trial quite loquacious.