No. 45,888

STATE OF KANSAS, *Appellee,* v. VERA IRENE PHIPPEN, *Appellant.*

(485 P. 2d 336)

Opinion filed May 15, 1971.

*Robert M. Brown,* of Topeka, argued the cause and was on the brief for the appellant.

*Donald P. Morrison,* Assistant County Attorney, argued the cause, and *Vern Miller,* Attorney General, and *Gene M. Olander,* County Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal by the defendant in a criminal

action from a conviction of manslaughter in the fourth degree. Various trial errors are assigned for reversal.

The case arises out of a homicide that was committed at approximately 9 o'clock p. m. on the 29th day of March, 1969. The deceased was John Bond, the husband of Arloa Bond. Vera Irene Phippen (defendant-appellant) was charged with the offense of murder in the first degree for this homicide.

Five adult persons and two children all resided at 505½ Forest Street in Topeka, Kansas. Their names were: John Bond and his wife, Arloa Bond, their infant child, Johnny, Mr. Wilhite, Mr. Phippen and his wife, the defendant, and her fourteen year old daughter, LaNita Long. The residence was described as a three-room garlow. These persons were evicted from this residence because there were too many people living in it. Part of the day in question was spent moving to the Trail Ridge Apartments at 2113 East 11th Street Terrace, Topeka, Kansas. All of the adult persons heretofore named were involved in the moving process to some extent.

The evidence discloses Mr. Bond had been drinking heavily and was "pilled up." Mrs. Bond said she was afraid of her husband "knowing that the day before he had been shooting barbiturates and seconals into his body to go with the liquor." When Mr. Bond was in this condition his wife, Arloa, had great fear of him because of previous beatings she had received.

The moving process was about completed when Mr. Phippen informed the defendant that John Bond had smarted off to him. The defendant stated she was not going to put up with that and asked her husband, Mr. Phippen, if he had a gun. Obligingly her husband procured his sawed-off shotgun and took it to the new residence where it was seen at several places in the course of the evening. Its last resting place before the fatal incident was under the bed of Mr. Phippen and the defendant. At this time the weapon was loaded and cocked, ready for use.

At approximately 8 or 8:30 p. m. on the evening of March 29 Mrs. Bond was downstairs in the new apartment with her child and LaNita Long. Mr. Phippen and the defendant were upstairs in the bedroom. When Mrs. Bond discovered the arrival of her husband she proceeded up the stairs with her child in her arms. There was testimony that Mrs. Bond exclaimed, "Ray, Ray, help, help, he's

here," as she proceeded up the stairs. She entered the bedroom which was occupied by Mr. Phippen and the defendant and went to a far corner away from the door of the bedroom. Mr. Bond had a can of tear gas in his hand and followed her up the stairs and went into the bedroom. Mrs. Bond asked Mr. Bond to leave her alone because she had the baby in her arms, but Mr. Bond made an effort to grab the baby away from her.

Mr. Phippen said, "Snake, go on, we don't want to have any trouble in here." Mr. Bond, after turning around and starting toward the door of the bedroom, observed the defendant with the sawed-off shotgun in her hand. It had been retrieved from underneath the bed by the defendant sometime during the course of the altercation between Mr. Bond and his wife. When Mr. Bond observed the shotgun he said "So you have got it."

As Mr. Bond approached the door, as if to leave the room, he came within very close proximity of the defendant. Mrs. Bond testified that the distance between Mr. Bond and the defendant was approximately three feet. At this point the sawed-off shotgun was discharged into the abdomen of Mr. Bond, mortally wounding him. The testimony is conflicting as to just what occurred immediately prior to the discharge of the shotgun.

Both Mr. Phippen and the defendant testified that as Mr. Bond walked toward the door he turned back toward the defendant and reached down like he was going to knock the gun out of the defendant's left hand or pull it away from her. They said when Mr. Bond pulled the gun it went off discharging into his abdomen.

The defendant testified:

"Q. Did you know the gun was even cocked?
"A. No, I didn't.
"Q. You say he pulled it out of your hands?
"A. Yeah, but I didn't know it was loaded and I didn't know it was cocked."

Mrs. Bond testified the defendant had the gun down at her side in her right hand. She testified:

"Q. Were you in a position to see whether or not he grabbed for the gun or not?
"A. No, sir.
"Q. Couldn't see that, or that didn't happen?
"A. It didn't happen, to my knowledge. When I looked to see—at him as he was starting to walk out of the room and his hand was up like this (indicating), and she was standing in front of him when he started to walk out of the room. *She just pulled the gun up and shot.*

"Q. At that time, did you say he was about three feet away from her; is that right?

"A. Yes."

LaNita Long went into the bedroom with Mrs. Bond as she ran up the stairs. She observed Mr. Bond and said she thought he was going to try to walk out of the door, but instead he turned and drew his hand back and it looked to her like he was going to hit her mother, the defendant, at which time she heard the gun go off. She said the gun was in the left hand of the defendant, who is right-handed, and it was being held at her side pointed down. She thought Mr. Bond was about two or three inches away from the barrel of the gun when it went off.

Mrs. Bond testified the defendant had previously said, "she was going to shoot one of them, she didn't care which one of them, the first one of them that —— with her," referring to Mr. Bond and Mr. Wilhite.

The evidence disclosed the shot was fired at very close range, making a round hole in his belt and trousers the size of a shotgun barrel.

On the evidence presented the trial court of its own volition refused to instruct the jury on first and second degree murder, thereby absolving the defendant of these offenses. The jury was instructed only on the offenses of manslaughter in the first degree and manslaughter in the fourth degree.

The appellant first contends the trial court erred in overruling her motion for discharge at the conclusion of the opening statement made by the state because the contents of the opening statement failed to state a cause of action.

In his opening statement the prosecuting attorney informed the jury the defendant was charged with the offense of murder in the first degree as set forth in the information. He indicated that because the jury members were present a few hours earlier when the appellant was formally arraigned the information would not be reread. He followed these remarks by naming the witnesses who would probably testify, but without reciting what their testimony would disclose to prove the appellant guilty of the offense of murder in the first degree or any other degree of homicide.

K. S. A. 62-1438 provides in part:

"The jury being impaneled and sworn, the trial may proceed in the following order:

"*First.* The prosecuting attorney must state the case, and offer the evidence in support of the prosecution."

The foregoing provisions do not require that the prosecutor state a cause of action in his opening statement to substantiate the charge in the information. Here the prosecuting attorney did advise the jury that this was a first degree murder case.

The appellant has not cited any authority in support of her argument. In *McCoy v. Fleming*, 153 Kan. 780, 113 P. 2d 1074, it was said:

". . . No citation of authorities in support of appellant's meager argument is contained in the brief, and this court might well conclude that counsel, after diligent search, had not been able to find any, in which case the judgment should be affirmed. . . ." (p. 783.)

The record fails to disclose the appellant was prejudiced by the opening statement of the prosecuting attorney, and it did not affect her substantial rights. (K. S. A. 62-1718.)

The appellant next contends the trial court erred in overruling her objection to statements previously made by her because the police officer, who arrived at the scene shortly after the shooting, failed to advise her of her rights pursuant to the *Miranda* decision.

The police officer dispatched to the Trail Ridge Apartments at the time of the incident on the day in question observed a young white male lying on his back, his legs slightly spread, with an open wound in his stomach, and between his legs was what appeared to be a canister of tear gas. Without giving a *Miranda* warning he then asked the appellant and her husband what had happened. He testified:

"Q. What did they say?
"A. Mrs. Phippen said that they were both in bed asleep and they heard an explosion and the lights come on and then the man was laying on the floor."

The officer was then asked whether or not Mr. Bond was alive before the ambulance drivers got there, to which he replied that he did observe him gasp; however, he could get no response from him; that he couldn't get any pulse or respiration.

It is argued by the appellant that although the answer given to the officer's question was exculpatory, it was clearly damaging to her in view of the testimony she gave under oath at the trial of the case.

In the landmark case of *Miranda v. Arizona*, 384 U. S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A. L. R. 3d 974, the United States Supreme Court said:

". . . the prosecution may not use statements, whether exculpatory or inculpatory, *stemming from custodial interrogation of the defendant* unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. . . ." (p. 444.) (Emphasis added.)

Later in the opinion the court said:

"Our decision is not intended to hamper the traditional function of police officers in investigating crime . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. . . ." (p. 477.)

Our decisions have recognized a distinction between the investigatory stage of the case and the custodial interrogation of one suspected of crime. (*State v. Little,* 201 Kan. 94, 439 P. 2d 387; and *State v. Hinkle,* 206 Kan. 472, 479 P. 2d 841.)·

Clearly on the facts here presented the inquiry by the police officer was a noncustodial, investigatory inquiry. The officer, having just arrived on the scene of the homicide, observed the deceased, and then asked Mr. and Mrs. Phippen what had happened. Under these circumstances no explanation of the appellant's rights was required.

The appellant contends the trial court erred in overruling her motion for discharge at the conclusion of the state's evidence because the state failed to establish the *corpus delicti.*

It is argued there is no evidence in the state's case in chief touching upon the cause of the decedent's death.

It is uniformly held by American courts that in homicide cases the *corpus delicti* is the body or substance of the crime which consists of the killing of the deceased by some criminal agency and is established by proof of two facts, that one person was killed, and that another person killed him. (*State v. Doyle,* 201 Kan. 469, 477, 441 P. 2d 846.)

If the evidence discloses clearly that a certain person is dead, that his death resulted, at the hands of another, from the use of violent or criminal means, the *corpus delicti* is sufficiently proved. (40 Am. Jur. 2d, Homicide, § 432, p. 693.) Furthermore, the *corpus delicti* may be established even though no coroner's autopsy has been performed, as here. (40 Am. Jur. 2d, Homicide, § 433, p. 694.)

The record is sufficient to establish that John Bond did in fact die of the shotgun wound inflicted by the appellant.

Arloa Bond testified that her husband died on March 29, 1969; that she was at the funeral and knew him to be dead. She also testified that on the evening in question the appellant had a gun in her right hand with which she shot John Bond. She also testified John Bond was shot at a range of three feet; that this shot hit him in the abdomen and "blew him right in two." She further said she saw "where he was shot and his guts were rolling out of him."

The police officer's testimony disclosed when he arrived at the scene shortly after the homicide he could get no pulse or respiration from the deceased.

There was no testimony during the state's case in chief that Mr. Bond tried to grab the shotgun from the appellant.

The *corpus delicti* may be proved by the direct testimony of persons who saw the act, or by indirect and circumstantial evidence, or partly by one and partly by another. No exclusive mode of proof of the *corpus delicti* is prescribed by the law. (*State v. Cippola,* 202 Kan. 624, 451 P. 2d 199, cert. denied 396 U. S. 967, 24 L. Ed. 2d 432, 90 S. Ct. 446.)

The appellant complains of the rebuttal testimony of Arloa Bond on the ground it was improper rebuttal testimony.

After the appellant and her husband testified in the defense of her case, that John Bond had tried to grab the gun away from her, causing the gun to fire as the muzzle of it was pulled toward him, the state called as a rebuttal witness Arloa Bond, who had previously testified in the state's case in chief. Mrs. Bond was permitted to testify on rebuttal that she had not seen her husband grab for the gun that was in the appellant's hand. This testimony on rebuttal was given over the appellant's objection.

The appellant contends Arloa Bond should have been asked these questions on direct examination in the state's case in chief.

Rebuttal testimony is permitted by the provisions of K. S. A. 62-1438.

The state is not required to anticipate every possible defense the defendant in a criminal action may offer. If so, the state would be required to elicit testimony in its case in chief to cover every possible contingency. Here the state was not required to anticipate the appellant's defense. Therefore, the state properly offered the testimony of Arloa Bond to rebut the testimony of the appellant and her husband after it was given to establish a defense. In *State v. Neff,* 169 Kan. 116, 218 P. 2d 248, the court held:

"It is always desirable that there should be an orderly presentation of proof. Rules pertaining thereto, however, are directory and not mandatory. An alteration in the prescribed customary order of proof rests in the sound judicial discretion of the trial court and the court's ruling will not be disturbed on appeal unless its exercise of discretion is abused." (Syl. ¶ 8.)

The appellant contends the verdict was contrary to the law and the evidence.

The trial court instructed the jury on manslaughter in the fourth degree as follows:

"Manslaughter in the fourth degree is the involuntary killing of another person by the act, procurement or culpable negligence of another which is not included in the definition of manslaughter in the first degree as herein defined. You are instructed that in order for a person to be guilty of culpable negligence within the meaning of that statute that person must be guilty of some act or acts constituting reckless indifference to the rights or safety of other persons."

K. S. A. 21-420 reads:

"Every other killing of a human being, by the act, procurement or culpable negligence of another, which would be manslaughter at the common law, and which is not excusable or justifiable, or is not declared in this article to be manslaughter in some other degree, shall be deemed manslaughter in the fourth degree."

The appellant contends the facts in the case considered most favorably for the state failed to make out the crime of manslaughter in the fourth degree as defined by 21-420, *supra*. The appellant does not object to the instruction or quarrel with the definition of culpable negligence given the jury, but contends the facts in this case disclose no culpable negligence.

This court in *State v. Brooks,* 187 Kan. 46, 354 P. 2d 89, relied upon the *Custer* case for the definition of manslaughter. It said:

"As held in *State v. Custer, supra* [129 Kan. 381, 282 Pac. 1071], and our other decisions, involuntary manslaughter is the killing of another unintentionally and without malice and results either from the commission of a lawful act or an unlawful act. If death resulted from negligent conduct in doing *a lawful act* it is necessary in order to constitute manslaughter that the conduct be reckless, that is, be such as to evince disregard or indifference to consequences, under circumstances involving danger to life and safety to others, although no harm was intended. On the other hand, if death resulted from *unlawful conduct* amounting to misdemeanors denounced by statutes *for the purpose of protecting human life and safety,* and the death would not have resulted except for the unlawful conduct, the killing would also be manslaughter at common law. Whether statutes are enacted and designed for the purpose of protecting human life and safety is a question of law for the courts to determine (*State v. Yowell,* 184 Kan. 352, *supra*)." (p. 50.)

In a criminal action the function of this court on appeal is not

to decide whether guilt was shown by the evidence beyond a reasonable doubt, but to ascertain whether there was, in the evidence, a basis for a reasonable inference of guilt. (*State v. Burgess,* 205 Kan. 224, 226, 468 P. 2d 229.)

The evidence is uncontroverted that at the time in question the appellant had a sawed-off shotgun in her hand, which was loaded and cocked. To find the appellant guilty of manslaughter in the fourth degree the jury must have found the gun was unintentionally discharged by the appellant. Under these circumstances two alternatives are possible to support the verdict. First, if the jury gave credence to her testimony that she did not know the gun was loaded or cocked, and the appellant as she was brandishing the gun aimed it at Mr. Bond when it was unintentionally discharged by her squeezing on the trigger, which the jury was entitled to find from the evidence, the appellant's conduct would constitute culpable negligence within the meaning of 21-420, *supra.* Second, if the jury found the appellant knew the gun was loaded and cocked, and the appellant as she was brandishing the gun aimed it at Mr. Bond when it was unintentionally discharged by Mr. Bond's attempt to pull it from her, which the jury was entitled to find from the evidence, the appellant's conduct would constitute culpable negligence within the meaning of 21-420, *supra.*

Finding no reversible error the judgment of the lower court is affirmed.