No. 50,615

STATE OF KANSAS, *Appellee,* v. CHARLES E. HENDERSON, *Appellant.*

(603 P.2d 613)

Opinion filed December 1, 1979.

*K. Mike Kimball,* of Hathaway & Kimball, of Ulysses, argued the cause, and *Gary R. Hathaway,* of the same firm, was with him on the brief for the appellant.

*Darrel E. Johnson,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

MILLER, J.: This is a direct appeal filed by Charles E. Henderson, who was found guilty by a jury of murder in the second degree, K.S.A. 21-3402, and felony theft, K.S.A. 21-3701. He was sentenced to imprisonment for not less than five years nor more than life for the homicide and not less than one nor more than ten years for felony theft, the sentences to run concurrently. He contends that the State failed to prove the corpus delicti, and the evidence is insufficient to support the homicide conviction; that he was prejudiced by the State's failure to prove the time of death as alleged in the bill of particulars; that the State committed prejudicial and reversible error in closing argument; that a mistrial should have been declared when an important witness was unable to appear in person, and the court erred in admitting the preliminary examination testimony of the witness; and that the court committed prejudicial error in failing to keep confidential the defendant's ex parte request for funds with which to retain a pathologist to aid in the defense. Since the sufficiency of the evidence is challenged, we shall state the facts in some detail.

The events out of which this action arose occurred during late January and early February, 1978. The principal figures involved are Mary Edna Haslett, an 83-year-old who lived alone in Elkhart, Kansas, and whose death occurred; Jim Hildreth, age 62, the State's principal witness; and the defendant, Charles E. Henderson. Henderson arrived in Elkhart two or three days before Mrs. Haslett's death. He stayed at Hildreth's home. Both Hildreth and Henderson visited Mrs. Haslett's home to drink liquor, watch TV, and socialize. During the day and early evening of January 31, 1978, the three persons were together at Mrs. Haslett's home. Hildreth and Henderson took some whiskey with them, and Mrs. Haslett had a supply. They drank whiskey and watched televi-

sion. Sometime shortly after 8 o'clock p.m. the supply was exhausted. Mrs. Haslett drove to the liquor store, obtained another bottle of whiskey, and returned home. Henderson wanted Mrs. Haslett to take him to Sublette, but she refused to do so because of the weather. Shortly after Mrs. Haslett returned from the liquor store, Hildreth left her home, indicating that he was going to the home of a neighbor to retrieve a dog chain. Henderson and Mrs. Haslett were still in the house when Hildreth left. At approximately 9:30 o'clock that evening, officers were called to the Jim Dandy Grocery, about a block and a half from Mrs. Haslett's house, in response to a complaint that Hildreth was causing a disturbance in the store. An officer picked up Hildreth and took him home. About two hours later, the police were called to Hildreth's residence upon his complaint that his house had been broken into and his boots and dog stolen. The officers found nothing to indicate that there had been a break-in.

The next morning, on February 1, Hildreth went to the Jim Dandy Grocery Store where he purchased a bottle of after-shave lotion and drank it. He then telephoned Mrs. Haslett, and upon receiving no answer, asked the proprietor of the store to accompany him to Mrs. Haslett's home. Upon entering the house, they discovered the body of Mrs. Haslett, sitting up in a rocking chair. There were no signs of violence. The police and coroner were summoned. One of the officers discovered footprints in the snow, leading away from the back of the house. The footprints had a peculiar asterisk mark in the heel; the footwear which matched the prints was not located. That same morning, a white pickup truck, which had been parked about two blocks from Mrs. Haslett's house, was reported stolen.

The exact time that Henderson left Mrs. Haslett's house is unknown. He was seen on the evening of January 31, when he purchased gasoline in Elkhart sometime between 8 and 9 o'clock. He was driving a white pickup truck. The missing truck was discovered the next morning, February 1, parked along highway 270 east of Hugoton. A CB radio, identified by serial number as having been in the white pickup truck, was sold by Henderson in Liberal, Kansas. Through force, Henderson obtained the use of a car at the Cimarron River bridge south of Ulysses. He was apprehended several days later while driving that car north of Ulysses in Kearny County.

The autopsy revealed that Mrs. Haslett died from asphyxia. The State's theory is that the asphyxia was caused by suffocation resulting from defendant's holding a pillow over her face. Search of Mrs. Haslett's home revealed a pillow underneath some neatly piled clothing on the bed. The pillow had a small bloodstain on it, and an area having saliva marks. Three physicians testified during the trial. The first was Mrs. Haslett's personal physician, Dr. Donidor Perido. He attended medical school in the Phillipines, then came to the United States. He testified that he practiced pathology at the United Hospital in Newark, New Jersey, where he spent one and one-half years, and performed approximately 100 to 150 autopsies. Following that he took a four-year surgical residency, where he was primarily in intensive care, taking care of heart patients; he then came to Kansas. He had been Mrs. Haslett's physician for two or three years prior to her death. She had been in the hospital three times for wrist fractures, and once for a fracture of the elbow. He had run several electrocardiograms; one run on December 9, 1976, indicated that she had previously had a heart attack. He expressed the opinion that Mrs. Haslett did not die of a heart attack; he based this on the electrocardiograms previously taken, his knowledge and examination of her, and the fact that when he examined her on the day she was found, he observed discolorations or mottling from the neck up. He expressed the opinion that if death had been caused by heart failure or acute myocardial infarction, there would have been a generalized mottling and dusty discoloration of the entire body.

The primary medical witness for the State was Dr. Hugh Halsey Boyle, a pathologist from Wichita, Kansas, who was called in by the district coroner to perform an autopsy. Dr. Boyle observed a very deep and dark dusky discoloration of the skin from the collarbone to the top of her scalp. He observed "three areas of bruising or scraping of the skin, quite superficial, over the area of the chin and below the lip and up to about the point of the chin on the right side a little bit more than the mid line similar scraping on this side of her nose, the right side and over the outer half of her eyebrow and there was a small, very tiny laceration with some blood on it at the very outside of her right eyebrow." Dr. Boyle expressed the opinion that there was no way that these injuries could have occurred naturally; the abrasions suggested to

him that something like a fabric had scraped her face under some pressure. He found no evidence of skin, flesh or blood under her fingernails, and he found no bruises of the linings of her gums or the inside of her cheeks. He examined the inside of the nostrils and found no fibers. He found no bruises or other evidence indicating strangulation. Dr. Boyle expressed the opinion that Mrs. Haslett "died of asphyxiation most probably caused by suffocation." He based that opinion upon the presence of the cyanotic state of the skin of her neck and scalp, the presence of fluid accumulation within the air spaces of the lungs, the presence of small pinpoint hemorrhages or bleeding points on the surface of both lungs, the presence of congestion or marked pooling of blood within the brain, the lining of the brain, and the absence of virtually any other disease process in her heart or other organs which would cause or contribute in any way to her sudden death. He was unable to fix the time of death. Dr. Boyle acknowledged that stoppage of the heart would cause asphyxiation; but from examination of the heart, he found no evidence of previous or current injury to the heart muscle that would interfere with the heart's function and no blockage of the arteries. He found no accumulation of fluids in the chest spaces, which he would anticipate finding if she had congestive heart failure.

Defendant's expert was Dr. William G. Eckert, board certified by the American Board of Pathology in Anatomic Pathology, Clinical Pathology and Forensic Pathology. Dr. Eckert is a respected authority in the field. His testimony was based upon Dr. Boyle's autopsy report, the examination of Mrs. Haslett's medical and hospital records, a review of the literature regarding asphyxial deaths, and the circumstantial evidence surrounding the death. He stated that death by suffocation of an adult is very uncommon, and that if suffocation had occurred, one would expect injury on both sides of the face, injury from the teeth inside the mouth, and circumstantial evidence of a struggle. Dr. Eckert expressed the opinion that the findings of Dr. Boyle were consistent with either a heart attack or with suffocation; that death was caused by asphyxiation; but that the cause of the asphyxiation could have been either heart attack or suffocation. He stated that the absence of changes in the heart or in the heart vessels, the coronary arteries, is not necessarily indicative of death by causes other than heart failure, as death may be due to a

problem of the electrical conduction of the heart. He expressed the opinion that both the discoloration of the skin in the area of the head and neck, and the findings as to fluid or absence of fluid in various portions of the body, were consistent with heart failure as well as with suffocation. In his opinion, both suffocation by another person's acts or heart failure are medical possibilities.

We turn first to the defendant's claim that the evidence was insufficient to support the second-degree murder conviction. The State's evidence in this case is entirely circumstantial. It is a well established rule in this jurisdiction that a conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Steward,* 219 Kan. 256, Syl. ¶ 13, 547 P.2d 773 (1976); *State v. Sparks,* 217 Kan. 204, 535 P.2d 901 (1975); *State v. Ritson,* 215 Kan. 742, 529 P.2d 90 (1974).

When a sufficiency of the evidence is challenged, then upon appellate review the issue before us is whether, upon the record evidence adduced at the trial, a rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 326, 61 L.Ed.2d 560, 578, 99 S.Ct. 2781 (1979). The appellate court must not weigh the evidence; if the essential elements of the charge are sustained by any competent evidence, the conviction stands. *State v. Racey,* 225 Kan. 404, 590 P.2d 1064 (1979).

The defendant challenges the sufficiency of the circumstantial evidence in two aspects: he contends that the State failed to prove the corpus delicti, and, assuming that a criminal death occurred, that the State failed to prove the defendant's guilt.

In homicide cases the corpus delicti is established by the proof of two facts: that one person was killed, and that another person killed him. *State v. Pyle,* 216 Kan. 423, 432, 532 P.2d 1309 (1975); *State v. Phippen,* 207 Kan. 224, 229, 485 P.2d 336 (1971); *State v. Doyle,* 201 Kan. 469, 477, 441 P.2d 846 (1968). The corpus delicti may be proved by direct testimony, by indirect or circumstantial evidence, or by a combination of both. *State v. Pyle,* 216 Kan. at 432.

The present case presents no problem of proof regarding the occurrence of human death, nor does the defendant challenge that portion of the corpus delicti. He does, however, contend that the testimony of the two physicians called by the State, Dr. Perido and Dr. Boyle, was insufficient to prove that the death resulted from a criminal act.

In *Doyle,* we said:

"Where the circumstances are as consistent with the absence as well as the presence of crime, the corpus delicti has not been proved since the evidence is susceptible to a construction which will prove innocence as well as guilt." *State v. Doyle,* 201 Kan. at 479.

In *Doyle,* we also said that circumstantial evidence is sufficient, if it is the best evidence available, quoting from 3 Warren on Homicide, p. 115:

"The evidence should be acted upon with great caution, and weighed with scrupulous circumspection, especially where a public desire to detect a crime creates a tendency to exaggerate. The facts must be not only consistent with the guilt of the defendant, but must be inconsistent with the hypothesis of innocence." *Doyle,* 201 Kan. at 478.

This suggestion, that the possibility of death by suicide or natural causes must be excluded, has not been followed in our later cases. In *State v. Johnson,* 222 Kan. 465, 565 P.2d 993 (1977), which affirmed a first-degree murder conviction, the requirement of examining the evidence so as to require incompatibility with "any reasonable hypothesis except guilt" is explicitly rejected. We note that the theory that the prosecution is under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt has been rejected by the United States Supreme Court. *Jackson v. Virginia,* 61 L.Ed.2d at 578; *Holland v. United States,* 348 U.S. 121, 140, 99 L.Ed. 150, 75 S.Ct. 127 (1954).

The *Doyle* rule, that proof must exclude death by accident or suicide beyond a reasonable doubt, was distinguished in *State v. Sagebiel,* 206 Kan. 482, 480 P.2d 44 (1971). There, *Doyle* was held readily distinguishable under the facts of that case because of eyewitness testimony of an altercation between Sagebiel and the deceased. Eyewitnesses were present when Sagebiel approached the deceased with a gun in hand and an altercation took place during which Sagebiel fired the weapon at the deceased at close range. Death occurred within one hour. In *Doyle,* the dead man was found seated behind the steering wheel of his car, a single bullet wound in his right temple, and a pistol lying beside his right hand on the front seat of the car. There was no evidence in *Doyle* to place the defendant at the scene of the alleged crime. The circumstantial evidence surrounding the death thus pointed no more strongly to criminal homicide than to death by accident

or suicide. Similarly, *Doyle* was distinguished on the basis of the facts in *State v. Sparks,* 217 Kan. 204. In *Sparks,* there was direct evidence placing the defendant in physical contact with the deceased, a two-year-old girl, who had suffered massive brain damage from repeated blows to the head. The injuries obviously did not result from self-inflicted blows, accident, or attempted suicide.

In the present case, it is apparent that death *could* have been caused by heart failure; however, the State produced the testimony of two qualified experts, Dr. Perido and Dr. Boyle, both of whom testified that in their professional opinion death did not result from a heart attack or natural causes. Dr. Boyle found injuries to the face which indicated that fabric, a mat or a pillow, had been pushed along the surface. It was his professional opinion that death was caused by asphyxiation "most probably caused by suffocation." Dr. Boyle examined the deceased's heart and major blood vessels during the course of the autopsy; Dr. Perido was familiar with the decedent's medical history, and with electrocardiograms taken over a period of several years immediately prior to her death. The weight of the testimony of these experts was, of course, for the jury; but we cannot say that this testimony was insufficient to establish the corpus delicti. The testimony of the defendant's expert, Dr. Eckert, is contrary to that of the State's experts; but however imposing Dr. Eckert's qualifications may be, however compelling his testimony, this court cannot weigh it on appeal, but must consider only the evidence supportive of the trial court's finding and the verdict. We conclude that the corpus delicti was adequately established.

Turning to proof of guilt of the defendant, the evidence shows that he was at the decedent's home shortly preceding her death; that he was alone with the decedent; and that he took his belongings from Hildreth's home, stole a pickup truck, and fled from the scene. He continued his flight until he was apprehended several days later. Under the circumstances, we hold that the evidence presented at trial was sufficient under the test of *Jackson v. Virginia,* noted above.

The defendant requested a bill of particulars pursuant to K.S.A. 22-3218(3), and in response thereto the State alleged that the defendant killed Mrs. Haslett between 8:00 and 9:40 o'clock p.m. on January 31, 1978. At trial the State did not present evidence as

to the exact time of death. Defendant claims that this failure frustrated two of his defenses, alibi and criminal liability of Hildreth, in that absent a specific time of death, defendant had to establish an alibi for the entire period from early evening on the thirty-first until discovery of the body at eight o'clock the next morning.

A bill of particulars serves the dual purpose of informing the defendant of the nature of the charge and the evidence against him to enable him to prepare his defense, and of enabling the defendant to avoid further prosecution for the same offense. The State is restricted in its proof to the items specified in the bill of particulars. The purpose of this restriction is to prevent the State from charging the defendant with one crime and convicting him of something else. *State v. Frames,* 213 Kan. 113, 116, 117, 515 P.2d 751 (1973). We also said:

"It is not necessary for the prosecution to prove each and every factual statement contained in the bill of particulars. So long as the state proves all of the necessary elements of the particular crime charged, then the evidence is sufficient to convict regardless of whether every statement in the bill of particulars is proved." (p. 117.)

The burden is on the State to prove each element of the crime. If the defendant was misled by the time in the bill of particulars, he presents upon appeal no specific ways in which he was prejudiced. The conviction does not rest upon evidence indicating a time of the crime outside the period alleged in the bill of particulars. Defendant failed to provide an effective alibi even for the period stated. Although his burden of alibi was theoretically increased by the State's failure to prove the exact time of the crime alleged, the added theoretical burden did not prejudice the defendant and was not material to his conviction. The alibi witness testified that the defendant, driving the white pickup, purchased gas; the witness first said that the purchase was as early as eight o'clock, and later stated the time as nine o'clock. We fail to see how the defendant has been prejudiced in his defense, or in his attempt to shift the responsibility to Hildreth, who was in Elkhart during the entire period of time.

We turn next to the defendant's contention that the prosecutor committed prejudicial error in his closing argument (1) by calling the jury's attention to the defendant's failure to testify; (2) by telling the jury that if they convicted the defendant, the convic-

tion could be reversed on appeal, but if they acquitted him, that judgment would stand; and (3) by stating his personal opinion as to the defendant's guilt.

Early in the closing argument, the special prosecutor discussed the historical background of the first ten amendments, saying in part:

"[O]ne of their methods of trial [in medieval courts of inquisition] was trial by ordeal. And that consisted of taking the defendant and tying him in a chair of some kind and submerging him in water and pulling him up and asking him if he wanted to tell the truth. If he didn't say what he was supposed to say, down he went again. If he didn't drown he was considered innocent. And there were other ordeals such as the breaking of joints. Now if the defendant didn't confess and he didn't die, he was considered innocent.

. . . .

"[W]hen our forefathers got together to adopt our constitution and later the first Ten Commandments which were the bill of rights, they were meticulously careful to see that innocent people would not be convicted. They set up all kind of safe guards. No arrest without warrant. Trial open to the public, before a jury of their own peers, which means their neighbors, which we have here. No search without a warrant, no trial by ordeal. In other words, the defendant is not forced to testify against himself. Proof beyond a reasonable doubt. Can't try the defendant twice for the same offense. In other words, in this trial when you get through if you return a verdict of not guilty, it makes the defendant even more innocent and perfect than any of you members of the jury because you are in effect giving him a certificate of innocence that will stand for all time and there is no way to reverse it. Now, if you convict him, it is possible that it will be reversed by another court, but if you find this defendant innocent that stands for all times. That is a certificate of his innocence."

In his final closing argument, the special prosecutor said:

"As far as I am concerned, I have got better things to do than to try to prosecute or send somebody to the pen that I don't think is guilty. I am sure some of you think I would do it; for your benefit and just for the record, I wouldn't dream of doing that. Maybe I would have to prosecute one that I didn't have my heart in if I had the office [of county attorney] but when I am a Special Prosecutor, I can assure you that there is no doubt in my mind, reasonable or doubt in my mind about reasonable doubt of this man."

Defense counsel objected promptly to the argument calling attention to the defendant's failure to testify, and to the statement of the special prosecutor's personal belief in the guilt of the accused. These were summarily overruled. No specific objection was made to that portion of the argument telling the jury that a conviction could be reversed, but an acquittal could not.

Comment by the prosecutor upon defendant's failure to testify violates the defendant's constitutional right against self-incrim-

ination. *Griffin v. California,* 380 U.S. 609, 14 L.Ed.2d 106, 85 S.Ct. 1229 (1965); *State v. Reeves,* 224 Kan. 90, 93, 577 P.2d 1175 (1978). Kansas has codified the *Griffin* rule in K.S.A. 60-439, which prohibits comment by counsel and the court upon a defendant's privileged failure to testify. Comment is not, however, a per se violation requiring reversal. Only error failing to meet the federal standard of harmless error, defined as proof beyond a reasonable doubt that the error did not contribute to the verdict, requires reversal. *Chapman v. California,* 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824 (1967); *State v. Reeves,* 224 Kan. at 93.

We noted, in the *Reeves* opinion, that the right to complain of prosecutorial mention of a defendant's failure to testify is generally precluded when the error is invited or provoked by the defendant or his counsel. Such is not the case here; the argument was not invited.

We must, in determining whether the comment was harmless, take into consideration the nature and extent of the comment, in comparison with the strength of the evidence of the defendant's guilt. See Annot., Failure to Testify - Comment On, 24 A.L.R.3d 1093, 1109; *State v. Rhodes,* 110 Ariz. 237, 517 P.2d 507 (1973); *People v. Garrison,* 252 Cal. App. 2d 511, 60 Cal. Rptr. 596 (1967).

The Tenth Circuit finds that error exists where "the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Knowles v. United States,* 224 F.2d 168, 170 (10th Cir. 1955). In such a case it finds reversible error despite failure to make a contemporaneous objection. *Doty v. United States,* 416 F.2d 887 (10th Cir. 1968).

When we apply these standards to the case at hand, we cannot find the error nonprejudicial. Although the comments were not explicit with respect to this defendant and were couched in the language of historical analysis, they are not harmless when compared with the totally circumstantial evidence presented against the accused. The State's evidence of guilt was not overwhelming, to say the least. The jury could naturally and necessarily take the statements as comment on the failure of the accused to testify. The error was not harmless beyond a reasonable doubt.

The special prosecutor's comment that if the jury erred by convicting, that error could be corrected on appeal, but an error in

acquitting could not be corrected, is an argument which diverts the jury from its duty to decide the case, and as such it is improper. Cases from fourteen states where prejudice was found are discussed in Annot., Argument - Jury's Mistake Correctible, 3 A.L.R.3d 1448; and see ABA Standards, The Prosecution Function § 5.8 (d) (Approved Draft, 1971). Since no contemporaneous objection was made to this argument, we consider it insofar as the cumulative effect of improper argument is concerned.

Finally, in this connection, we consider the prosecutor's statement of his personal belief of the defendant's guilt. In *State v. McClain,* 216 Kan. 602, 533 P.2d 1277 (1975), we cited with approval ABA Standards, The Prosecution Function § 5.8(b) (Approved Draft, 1971), which classifies such argument as unprofessional. The argument is also violative of our Rule No. 225, the Code of Professional Responsibility, DR 7-106 (C) (4), which provides that "In appearing in his professional capacity before a tribunal, a lawyer shall not . . . assert his personal opinion . . . as to the guilt or innocence of an accused . . . ." 224 Kan. cv-cvi.

In *McClain,* we said that arguments stating the personal belief of the prosecutor in the accused's guilt "may be considered and adjudicated in terms of the prejudicial effect thereof, rather than in terms merely of professional propriety . . . ." 216 Kan. at 608.

There was no contemporaneous objection in *McClain,* and the comment was mild, amounting "to no more than comment on the inherent improbability of the testimony given by appellant . . . ." We found no prejudice. Likewise, in *State v. Smith & Miller,* 224 Kan. 662, 585 P.2d 1006 (1978), *cert. denied* 441 U.S. 964 (1979), where the evidence of guilt was strong, and where the trial judge, after objection, struck the improper comment and admonished the jury to disregard it, we found no reversible error.

Counsel for the State suggest that the argument was provoked and invited by defense counsel in closing argument. The statement of belief in guilt, however, went substantially beyond the argument provoked. Response could well have been limited to the prosecutorial function without the infusion of personal opinion as to the guilt of the accused.

When we consider the entire picture, including the unambiguous opinion of guilt expressed, the standing of counsel in the community where trial was held, the overruling of defense counsel's prompt objection, and the minimal strength of the State's evidence of guilt, we conclude that the argument was prejudicial.

We conclude that the defendant suffered substantial prejudice because of the improper argument of the prosecutor in the three areas mentioned - comment on the accused's failure to testify, argument that error in conviction could be cured on appeal, and statement of personal belief in defendant's guilt—and that because of these errors, a new trial must be granted.

We turn next to the claim that when a witness could not appear, the trial court should have declared a mistrial; and that the court erred in admitting the preliminary hearing transcript of the witness's testimony into evidence. The witness was one who sold gasoline to the defendant; in substance, he testified at the preliminary hearings that the purchase was between 8 and 9 o'clock p.m. Defendant *hoped* the witness would designate an earlier hour when he testified at trial.

The witness attended trial on the first day, but was not called. He became suddenly ill, was hospitalized, and was unable to attend during the rest of the trial. He had been called by the State, and had been fully cross-examined by defense counsel at the preliminary hearing. The trial court denied the defense motion for a mistrial, and permitted the State to introduce the transcript of the witness's testimony.

We have discussed the use, under similar circumstances, of preliminary hearing transcripts in many cases. See *State v. Steward*, 219 Kan. 256, 264, 547 P.2d 773 (1976), and cases therein cited; also see K.S.A. 60-460(*c*). In *State v. Alderdice*, 221 Kan. 684, 561 P.2d 845 (1977), we said:

"The transcript of the preliminary hearing testimony of a witness may be received in evidence when, by the exercise of reasonable diligence, the witness cannot be produced at trial. The right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirements." Syl. ¶ 1.

We find no error in the trial court's refusal to declare a mistrial, and in receiving the preliminary hearing transcript into evidence, under the circumstances of this case.

Lastly, defendant complains because though the trial court

entertained an ex parte defense motion and authorized the employment of a pathologist at public expense, as an expert witness for the defense, the trial judge refused to keep that authorization confidential. Defendant makes no showing of prejudice. The State had already endorsed the names of its experts, Dr. Perido and Dr. Boyle, on the original complaint and on the information; the State secured no additional experts to counter the testimony of defendant's expert. The case relied upon by defendant, *Marshall v. United States,* 423 F.2d 1315 (10th Cir. 1970), is not persuasive. There the court held an adversary, not an ex parte hearing. Prejudice was obvious. Here the defendant was not required to disclose the reasons for his request or to disclose defense strategy. We find no prejudicial error.

For the reasons stated above, the judgment is reversed and the case is remanded with directions to grant a new trial.

FROMME, J., not participating.

MCFARLAND, J., concurring in part and dissenting in part: I concur with the majority in the decision reversing the conviction. I respectfully dissent from that portion of the majority opinion which holds that the comments of the special prosecutor constituted a comment on the defendant's failure to testify. The comments are merely a historical statement as to changing procedures for determining guilt or innocence of a person accused of a crime. I see nothing in the comments which can reasonably be construed as referring to this particular defendant's failure to testify in this particular case.