No. 56,030

GEORGE DOUGLAS, JR., Individually, and PATRICK C. DOUGLAS, by and through GEORGE DOUGLAS, JR., his Father, Next Friend and Guardian, Individually, and Heirs-at-Law of PATRICIA DOUGLAS, *Appellants*, v. CARL J. LOMBARDINO and HUMANA OF KANSAS, INC., a Corporation, d/b/a SUBURBAN MEDICAL CENTER, *Appellees*.

(693 P.2d 1138)

Opinion filed January 26, 1985.

*Edward M. Boyle*, of Payne & Jones, Chartered, of Olathe, argued the cause, and *Bruce Keplinger*, of the same firm, was with him on the briefs for the appellants.

*Jerome V. Bales*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, argued the cause, and *Frank Saunders, Jr.*, of the same firm, was with him on the brief for the appellee, Carl J. Lombardino.

*Gordon N. Myerson*, of Morris, Larson, King, Stamper & Bold, of Kansas City, Missouri, argued the cause, and *James L. Eisenbrandt*, of James L. Eisenbrandt, Chartered, of Overland Park, was with him on the brief for the appellee, Humana of Kansas, Inc., a corporation, d/b/a Suburban Medical Center.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is a medical malpractice action brought by George Douglas, Jr., the surviving spouse of Patricia Douglas, on his own behalf and on behalf of their infant son, Patrick Douglas, arising from Patricia Douglas' death on December 28, 1981 at Suburban Medical Center, following administration of a local anesthetic for a Caesarean section. The suit was brought against Humana of Kansas, Inc., the operator of Suburban Medical Center, and Dr. Carl J. Lombardino, a staff anesthesiologist at Suburban who administered the anesthetic to Patricia Douglas. The action sought damages for George Douglas' emotional distress caused by the events he witnessed, and damages sustained by the next of kin of Patricia Douglas as a result of her death. The jury found that none of the defendants were at fault. The plaintiffs moved for a new trial which was denied by the trial judge. Numerous trial errors are asserted by the plaintiffs on appeal.

On December 27, 1981, Patricia Douglas, age 31, was admitted

to Suburban Medical Center for childbirth. Her obstetrician was Dr. Hal Younglove. At 12:00 p.m., on December 28, Mrs. Douglas was taken to the operating room where a Caesarean section was to be performed. Her husband was admitted with her to observe the delivery. Dr. Carl Lombardino, a staff anesthesiologist, was to anesthetize Mrs. Douglas in preparation for the delivery.

The procedure intended was a lumbar epidural in which a local anesthetic is injected in the lower back area outside the membrane that covers the spinal cord to desensitize the nerves there. In administering a lumbar epidural, the anesthesiologist must take care not to penetrate the spinal cord because this would create too strong a block, resulting in paralysis. The anesthesiologist must also take care not to penetrate any blood vessels which are engorged during pregnancy. Penetration of the blood vessels is referred to as an intravascular injection. If an intravascular injection occurs, the body's circulatory system carries the anesthetic to the brain within 30 seconds. Convulsions and respiratory arrest may occur. If the patient convulses and stops breathing, there is a resuscitation procedure which, if followed, will normally bring the patient back.

The anesthetic involved in this case was bupivacaine, which is marketed under the name Marcaine by Breon Laboratories. At 12:20 p.m., Dr. Lombardino first injected a 3 cc. test dose of Marcaine into Mrs. Douglas and then aspirated (pulled back on the plunger of the syringe) to see if any blood would come back into the syringe. There was no aspiration of blood to indicate to Dr. Lombardino that he was in a vein. Dr. Lombardino then injected a therapeutic dose of 21 cc.'s of Marcaine at a rate of 1 cc. per second over a period of twenty seconds. At 12:25, Mrs. Douglas began having violent convulsions. Mr. Douglas was immediately taken from the room. As soon as she began convulsing, Mrs. Douglas was turned from her side onto her back. An oxygen mask was placed on Mrs. Douglas' face simultaneously as she was placed on her back by Judy Peck, a certified registered nurse anesthetist. It took approximately 30 seconds to get Mrs. Douglas on her back.

Nurse Elias testified that she entered the delivery room at 12:25 p.m. and saw Mrs. Douglas on her side having a seizure. She then assisted in turning Mrs. Douglas onto her back. She

observed Nurse Peck ventilating Mrs. Douglas as soon as she had been turned.

By the time Mrs. Douglas was on her back, Dr. LaSalle, a staff anesthesiologist, had been called "stat" (meaning "come now - immediately"). Dr. Younglove, the obstetrician, was also summoned. There is some dispute as to whether a formal Code Blue was ever called, but the testimony established that all of the necessary doctors were present when needed. Nurse Elias testified that she did not call a Code Blue because all of the right doctors were present. Mr. Douglas testified that he heard a Code Blue call on the intercom.

Mrs. Douglas was given 200 mg. of Pentathol after she was on her back. Pentathol was given for the purpose of stopping the seizure. She was also given 40 mg. of Succinylcholine to relax her jaw so that she could be intubated. Dr. Lombardino then unsuccessfully attempted intubation. Dr. LaSalle arrived within 15-30 seconds after this attempt and successfully intubated Mrs. Douglas within ten seconds. At that time, Nurse Peck was also giving closed chest massage which she continued to administer. The intubation was completed sometime between 12:27 and 12:30 p.m. Nurse Elias testified that she listened to the fetal heart tones at 12:28 and remembers that Mrs. Douglas had been intubated at that time. CPR was started at 12:27 p.m.

Dr. Younglove, the obstetrician, arrived in the operating room at 12:27 p.m. He testified that Mrs. Douglas had been intubated by 12:29. Intubation had to have been completed before he could begin delivery. The delivery took between 30 seconds and one minute, and at 12:30 p.m. a viable male infant was delivered.

After Dr. LaSalle was in the room, Mrs. Douglas was hooked up to a monitor and it was determined that her heart was in ventricular fibrillation, meaning her heart was moving irregularly and abnormally without generating any blood pressure. Defibrillation was first attempted after the baby was born but before the incision was closed, sometime between 12:33 and 12:35 p.m.

At 12:35 p.m. Mrs. Douglas was given an ampule of sodium bicarbonate to balance the acid that is produced in the blood as a result of the convulsions. This dose was repeated at 12:40 and at 12:45 and again at 12:55. The blood gas was first read at 1:00 and indicated that, although Mrs. Douglas was well oxygenated, her

acidity was too high. This was brought to within the normal range by 1:30.

The resuscitation measures were continued for two and one-half hours after Mrs. Douglas first convulsed. She was finally pronounced dead at 3:03 p.m.

At trial, the plaintiffs alleged that Mrs. Douglas died as a result of the inappropriate administration of the regional anesthetic and the subsequent incorrect and substandard behavior of Dr. Lombardino in attempting to resuscitate her and by the inappropriate preparations by the hospital for drug availability in case of emergency. The defendants' position was that Dr. Lombardino was not negligent, that he followed all recognized procedures, that all drugs were available when needed, and that the reason for Mrs. Douglas' death was her reaction to the cardiotoxic nature of Marcaine — a fact unknown to anyone at the time of her death.

The plaintiffs' position was based on the common medical belief at the time that an anesthetic injected directly into the bloodstream interferes with respiration, and morbidity or mortality is a result of this lack of oxygen to the brain which is preventable by proper resuscitative measures. The plaintiffs' expert witness, Dr. Abouleish, a well-qualified anesthesiologist, expressed the opinion that Mrs. Douglas died because of substandard resuscitative measures, including too large a dose of Pentathol after the convulsion occurred which added to the depression of her heart, too small a dose of Succinycholine to completely relax her, and too long a delay in the administration of sodium bicarbonate. He also testified that the hospital was negligent because the emergency resuscitative drugs were not immediately available in the operating room.

The experts called by the defendants stated they believed Dr. Lombardino had followed acceptable medical practice. Both the defendants' experts and the plaintiffs' experts testified that the intravascular injection of Marcaine was inadvertent. The reason there was no aspiration of blood into the syringe was probably due to a collapse of the blood vessel wall against the needle. The defendants' expert, Dr. Shnider, testified that while the test dose of 3 cc.'s might not have been enough to determine if the injection was in a blood vessel, it was a dose commonly recommended and would indicate if the needle was in the spinal area. The defendants' experts, Dr. Albright and Dr. Shnider, both

testified that the amount of Marcaine given and the rapidity of its injection were well within the standard of care in December of 1981 and did not exceed the manufacturer's recommended dosage.

Dr. Lombardino testified that all the resuscitative medications were drawn out and ready prior to the time that the procedure started; someone had to go across the hall to get the tray of medicine, but they were available as soon as he needed them. Nurse Peck recalled that the medications were already in the room.

Both Dr. Shnider and Dr. Albright testified that the amounts of Pentathol and Succinycholine given were within the standard of care. Although Dr. Shnider would have recommended less Pentathol, he testified that Pentathol does not cause the heart to go into fibrillation, which is what happened to Mrs. Douglas. He further testified that the amount of Succinycholine was appropriate because it did what it was supposed to do - it relaxed her enough to be intubated.

Dr. Shnider also testified that although ideally a blood gas test should have been taken earlier, under the circumstances of the delivery of the baby and the closed chest massage, the doctors did the best they could. The amount of sodium bicarbonate given prior to the blood gas test was within the recommended amount.

After the defendants' experts testified that Dr. Lombardino had followed acceptable medical practice in attempting to resuscitate Mrs. Douglas, they stated that the only reasonable explanation of Mrs. Douglas' death was that the anesthetic she was given — Marcaine — was cardiotoxic. According to this theory, in a small number of cases when the anesthetic is injected intravascularly it *directly* depresses the heart and prevents resuscitation. This is opposed to the usual case where cessation of the heart is secondary to lack of oxygen which is caused by the paralysis of the brain.

The defense theory was based on the testimony of Dr. Albright and Dr. Shnider, both highly respected and qualified anesthesiologists. The evidence showed that in 1979, Dr. Albright had published an editorial proposing his hypothesis that Marcaine could be directly cardiotoxic. He wrote this editorial after learning of several instances of sudden cardiac arrest following injection of Marcaine into the patient's vein. In May of 1980, after

learning of other similar incidents, Dr. Albright published an abstract of his theory entitled "Cardiac and CNS Reactions to Etidocaine and Bupivacaine." In May of 1981, the United States Food and Drug Administration convened hearings of its special Anesthetic and Life Support Drug Advisory Committee in connection with Dr. Albright's hypothesis. Dr. Albright was not present at the meeting. Dr. Albright was present at the next meeting in May of 1982. At that meeting, the FDA concluded that the theory was not proven and that laboratory confirmation was needed before they could conclude that this drug had more cardiotoxicity than any other clinically used drug.

Dr. Albright expressed his opinion that Mrs. Douglas died as a result of the direct cardiotoxicity of Marcaine. In his testimony, he stated that .75% Marcaine (the recommended concentration which was used on Mrs. Douglas) should be reduced. He acknowledged that at the time of trial, the consensus in his field did not share his opinion as to the cardiotoxicity of Marcaine.

Dr. Shnider, also an expert for the defense, testified that he had performed animal (sheep) studies as a result of reading the Albright theory. The validity of the test method he employed is not at issue. Basically, he compared Marcaine to another local anesthetic, Xylocaine. After conducting two studies, he found that none of the sheep injected with either a low dose or high dose of Xylocaine died, and none developed ventricular arrhythmias (fibrillation). However, one out of six sheep injected with a low dose of Marcaine died, and all six sheep injected with the high dose of Marcaine died. Even the sheep that did not die with the low dose of Marcaine did get serious ventricular arrhythmias. All the proper resuscitative measures were taken with each of the sheep.

Dr. Shnider expressed the opinion that his sheep studies gave a proper representation of how the drug would act in humans. He also opined that with respect to humans, Marcaine is cardiotoxic in normal therapeutic doses when accidentally injected into a blood vessel. He testified that he now recommends a test dose of Marcaine mixed with Epinephrine which would indicate to the anesthesiologist whether he was injecting into a vein. This procedure was also recommended by the FDA at their 1982 meeting.

Dr. Shnider testified that Dr. Lombardino acted properly in

attempting to resuscitate Mrs. Douglas and in his opinion her death was due to the cardiotoxic effect of Marcaine.

At the time this case went to trial, only part of Dr. Shnider's sheep study had been published. He was in the process of writing an article and preparing an abstract for presentation. The FDA did not have any of Dr. Shnider's data on the second sheep study at the time of its May 1982 meeting.

The plaintiffs sought to prove that the theory held by Dr. Albright and Dr. Shnider is not held by the medical community as a whole and is based on insubstantial evidence. Dr. Abouleish, plaintiffs' expert, attacked in detail the conclusions of Albright and Shnider. The evidence of the cardiotoxic nature of Marcaine was admitted over the objection of the plaintiffs. At the close of the trial, the jury was instructed on this theory and the plaintiffs now claim this was error. The jury was instructed to compare the fault of the drug's manufacturer, Breon, if they found that Marcaine was cardiotoxic. The plaintiffs claim this was error as Breon had not been joined and there was no evidence presented by which to establish its legal liability.

Also over plaintiffs' objection, the court allowed testimony of the theory that Mrs. Douglas had an anaphylactic (severe allergic) reaction to Marcaine. Dr. Pham, who performed the autopsy, expressed this opinion in his autopsy report. Based on Dr. Pham's report, Dr. Younglove testified that the death of Mrs. Douglas was caused by an anaphylactic reaction. All experts agreed that this conclusion was probably not correct, but Dr. Shnider and Dr. Albright believed it was natural for a pathologist to reach this conclusion based on the autopsy findings. The court submitted this issue to the jury.

After deliberating, the jury returned a verdict that Dr. Lombardino, the hospital, and Breon were all free from fault.

The plaintiffs first contend that the trial court erred in submitting two different standard of care instructions for the jury to use in evaluating Dr. Lombardino's conduct. The court included both PIK Civ. 2d 15.01 and PIK Civ. 2d 15.12 (1981 Supp.) in its instructions to the jury. These instructions read as follows:

15.01. "In performing professional services for a patient, a (physician)(dentist) has a duty to use that degree of learning and skill ordinarily possessed and used by members of his profession and *of his school of medicine* in the community in which he practices, or in similar communities, and under like circumstances. In

the application of this skill and learning the (physician)(dentist) should also use ordinary care and diligence.

"A failure to do so is a form of negligence that is called malpractice."(Emphasis added.)

15.12. "A (physician)(surgeon) who holds himself out to be a specialist in a particular field of medicine must use his skill and knowledge as a specialist in a manner consistent with the special degree of skill and knowledge ordinarily possessed by other specialists in the same field of expertise at the time of the (diagnosis) (treatment)."

Plaintiffs argue that since it was clearly established at trial that Dr. Lombardino was a specialist, the giving of both instructions had the potential of misleading the jury. Plaintiffs contend that the two instructions are "inconsistent" and cite the Notes on Use for PIK Civ. 2d 15.12 (1981 Supp.), which state in part:

"This instruction should be used rather than PIK 15.01 when the defendant has held himself out as being a specialist in an area commonly recognized as such in his profession. If there is a dispute as to which standard is applicable in light of the evidence in the case, both instructions should be given, with the appropriate modifications being made if necessary to avoid confusion for the jury."

While the Notes on Use do provide guidelines, they are not authority on which we rely. PIK Civ. 2d 15.12 more clearly defines the duty of a specialist, but we do not find it inconsistent with PIK Civ. 2d 15.01. Before the enactment of PIK Civ. 2d 15.12, PIK Civ 2d 15.01 was used to define the duty of a specialist as well as that of a general practitioner by stating that a physician was to use that degree of learning and skill ordinarily possessed and used by members "of his school of medicine." The comment to PIK Civ. 2d 15.01 explains what is meant by "his school of medicine":

"A doctor is entitled to be judged according to the standards of the particular school of medicine to which he belongs. If a doctor is a specialist and the patient accepts treatment with that understanding, it is the generally accepted rule that a physician, surgeon or dentist who holds himself out to be a specialist is bound to bring to the discharge of his professional duties as a specialist that degree of skill, care, and learning ordinarily possessed by specialists of a similar class, having regard to the existing state of knowledge in medicine, surgery and dentistry, that is, a higher degree of skill, care, and learning than that of the average practitioner."

In this case, it was clearly established that Dr. Lombardino, as an anesthesiologist, was a specialist. A reading of the record reveals that all "standard of care" testimony was clearly that of standard of care of a specialist. Since there was no dispute in the evidence that the defendant was a specialist, the jury could not

have been confused on this point. The PIK Civ. 2d 15.01 instruction gave the jury a frame of reference so they could see that Dr. Lombardino, as a specialist, was being held to a higher degree of care than a general practitioner. If there had been a dispute in the evidence as to whether Dr. Lombardino was a specialist, then the giving of both instructions, without modifications or explanations, might have been confusing. But, in this case, there was no dispute.

Instructions are to be considered together and read as a whole, without isolating any one instruction; if jury instructions properly and fairly state the law as applied to the facts of the case when considered as a whole, and if the jury could not reasonably be misled by them, the instructions should be approved on appeal. *Powers v. Kansas Power & Light Co.*, 234 Kan. 89, 671 P.2d 491 (1983). We do not find that the jury could have been misled by the two instructions given on the standard of care.

The plaintiffs cite several cases from other jurisdictions which they contend support their position that it is reversible error to instruct the jury as to both the general practitioner standard of care and the specialist standard of care. After reviewing these cases, we find that none of them stand for that proposition. In *Atkins v. Clein*, 3 Wash. 2d 168, 100 P.2d 1 (1940), the jury was given one instruction that a *specialist* was to be held to the knowledge and skill of like specialists, and another instruction that a *specialist* was to be held to the degree of care and skill used by physicians generally. Since the latter instruction was incorrect and clearly in conflict with the first instruction, the court found reversible error. No such error was made in the instructions in the present case.

Similarly, in *McPhee v. Reichel*, 461 F.2d 947 (3rd Cir. 1972), the trial court gave three different standards to apply to a specialist, some of which were incorrect. One of the instructions referred to the care which "*he* would exercise based on his ability, his background, and his expertise." 461 F.2d at 951.

The other cases relied on by plaintiffs are simply not in point because no specialist instruction was given when the doctor was a specialist. See *Coleman v. Wilson*, 85 N.J.L. 203, 88 A. 1059 (1913); *Robbins v. Footer*, 553 F.2d 123 (D.C. Cir. 1977); *Stevens v. Duxbury*, 97 Nev. 517, 634 P.2d 1212 (1981).

Since we find no case which supports plaintiffs' position, and

since we believe the instructions were not conflicting or confusing, we find that there was no error by the trial court in submitting the two instructions.

The plaintiffs' next contention is that the trial court erred in admitting evidence of an anaphylactic reaction to Marcaine and in submitting the issue to the jury.

Dr. Pham, the hospital's pathologist, performed the autopsy of Mrs. Douglas. In his report, he concluded:

"The possibility of an anaphylactic reaction to Marcaine is likely to be the cause of shock of this patient, particularly with the immediate onset of cardiac arrest and seizures following injection. The pathological findings of massive edema and congestion of the visceral organs are changes consistent with shock of various causes including an anaphylactic reaction."

Dr. Younglove, the treating obstetrician, concluded in the discharge summary of the hospital chart that the cause of death was an anaphylactic reaction. He based his opinion on Dr. Pham's report. Dr. Pham was unavailable to testify at trial. The defendants, in order to introduce the "anaphylactic theory" as a defense in this case, sought to introduce the entire pathological report of Dr. Pham as well as the testimony of Dr. Younglove about his conclusions.

Plaintiffs submitted two motions in limine on this issue: a motion to exclude the opinion portion of the autopsy report and opinion evidence of Dr. Pham, and a motion to exclude discharge summary and case summary opinions for medical records. These motions were argued prior to trial. We note that at all times, plaintiffs sought only to exclude the opinion portion of the autopsy report by Dr. Pham and the hospital record which contained the opinion of Dr. Younglove. At no time did the plaintiffs move to exclude all evidence or testimony concerning the anaphylactic theory.

During the pretrial hearing on the motion in limine, the following statements were made:

"[Defense counsel] . . . So, I think you're taking a big step by saying we're not even going to mention anaphylactic reaction.

"[Plaintiffs' counsel]: I don't think I've asked you to say that.

"[Defense counsel]: We're going to say the evidence of anaphylactic reaction is the conclusion of Dr. Pham and Dr. Younglove.

"[Plaintiffs' counsel]: Younglove will be here to testify. I'm just asking that the portion of the record that's conclusional be kept out and they can get into anaphylactic reaction if they've got significant admissible evidence on it."

In the argument concerning the exclusion of the hospital record which contained Dr. Younglove's opinion on an anaphylactic reaction, plaintiffs' counsel admitted that the motion was moot if, in fact, Dr. Younglove was going to appear and testify.

The trial court originally sustained the motion in limine with respect to the autopsy, but reserved the option of changing the ruling. The trial court denied the motion concerning the hospital record. Later, the court did allow the autopsy report to be admitted in its entirety, including the conclusion that the cause of death was an anaphylactic reaction. Prior to this ruling, plaintiffs' counsel expressly waived any objections they may have had about the defense being allowed to cross-examine Dr. Abouleish, plaintiffs' expert, on the possibility of an anaphylactic reaction. Also, prior to this ruling, plaintiffs' counsel questioned Dr. Abouleish about this theory.

Subsequent to the denial of the motion in limine on the autopsy report, the defendant called Dr. Albright to the stand. When he was asked to comment on Dr. Pham's conclusion in the autopsy report, the plaintiffs' counsel did not object. The entire autopsy report was read into evidence later in the trial without any objection from plaintiffs.

K.S.A. 60-404 provides:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

As stated, the plaintiffs did not file a motion in limine to exclude all evidence, and opinions thereof, of an anaphylactic reaction. As to this evidence outside the scope of the motion, plaintiffs failed to make contemporaneous objections when it was introduced and, in fact, the plaintiffs' counsel elicited testimony from several witnesses on this theory. The failure of plaintiffs to object contemporaneously to this evidence prohibits them from complaining about its admission. *State v. Phipps*, 224 Kan. 158, 578 P.2d 709 (1978).

Similarly, the failure of plaintiffs to object to the reading of Dr. Pham's conclusion in the autopsy report constitutes a waiver of any objection they had to the court's denial of the motion in limine. As stated in *Reeve v. McBrearety*, 8 Kan. App. 2d 419, 660 P.2d 75 (1983): "When a motion in limine is denied, the

moving party must object to the evidence at the trial to preserve the issue on appeal. See Annot., 63 A.L.R. 3d 311." 8 Kan. App. 2d at 422. Therefore, the plaintiffs waived any claimed error by failing to contemporaneously object to the admission of this evidence.

Plaintiffs also claim that it was error to submit the issue of an anaphylactic reaction to the jury. Instruction No. 9 stated in part: "The defendants claim that the cardiotoxic or allergenic nature of Marcaine made resuscitation impossible." When this instruction was read to the jury, plaintiffs stated, "no objection." Pursuant to K.S.A. 60-251(b), a party cannot assign as error the giving of an instruction unless the party objects to the same before the jury retires, unless the instruction is clearly erroneous. See also *Powers v. Kansas Power & Light Co.*, 234 Kan. at 92.

We do not believe this instruction was "clearly erroneous." The plaintiffs argue that there was not proper foundation for the giving of this instruction because such a theory was derived from "mere speculation" on the part of Dr. Pham. They also argue that the unanimous testimony of the experts in the field was that there was no basis for a finding that an anaphylactic reaction was the cause of death. We disagree with both of these contentions. Although Dr. Pham used the word "possibility" in his conclusion, this does not indicate his conclusion was mere speculation. When the report is taken as a whole, the conclusion reflects a professional opinion as to the cause of death and is admissible. *Nunez v. Wilson*, 211 Kan. 443, Syl. ¶ 2, 507 P.2d 329 (1973). Both Dr. Shnider and Dr. Albright testified it was understandable that Dr. Pham reached this conclusion.

We have found that this issue was voluntarily tried by all parties. Even though the evidence as to the cardiotoxicity of Marcaine was more abundant, and probably more persuasive than this theory, we feel it was for the jury to weigh the evidence given. We agree with the following statement by the trial court in its memorandum opinion:

"I do not believe there was any confusion on the part of the jury as regards to the question of anaphylactic reaction. Although one might have desired a quicker admission that this was not a viable diagnosis, the fact that the pathologist and treating physician thought her reaction was an anaphylactic one underlined the defendants' position that if Dr. Lombardino's actions were correct, the only explanation had to be a physical reaction by Mrs. Douglas to the drug. The fact that the defendants' evidence later showed that it could not have been an

anaphylactic reaction and was more probably a cardiotoxic reaction, does not make the evidence inadmissible. The Court believes it was appropriate to allow the evidence in both as a portion of the medical record and as a reflection of the belief of some of the physicians involved that the death was not due to physician error."

The plaintiffs argue that the instruction on anaphylactic reaction prejudiced them because the only possible explanation of the verdict finding no one at fault was that the jury concluded Mrs. Douglas died of an anaphylactic reaction. This contention is without merit. It is more likely that the jury found Marcaine to be cardiotoxic and found Breon, the manufacturer, free from fault because it had complied with FDA labeling requirements and had no reason to know of the possible danger of Marcaine. For these reasons, we hold that it was not error to either allow into evidence the anaphylactic reaction theory or to instruct the jury on that theory.

The plaintiffs next contend the trial court erred in admitting evidence concerning the theory that Marcaine is cardiotoxic and in submitting this issue to the jury as a possible cause of Mrs. Douglas' death. They also contend the court erred in instructing the jury to compare the fault of Breon, the manufacturer of Marcaine, who was not joined as a defendant in this action.

Prior to the trial, the plaintiffs filed a motion in limine to exclude all testimony that Marcaine may be cardiotoxic. This motion was overruled by the court. The plaintiffs at no time renewed their objection when the evidence was offered at the time of trial. For the same reasons and authorities previously cited in regard to the plaintiffs' failure to contemporaneously object to the anaphylactic reaction evidence, the plaintiffs are not in a position to claim error on the admission of this evidence. Also, the plaintiffs did not object when the instruction on the cardiotoxicity of Marcaine was read to the jury. Again, by failing to object, the plaintiffs waived their right to assert error in the giving of this instruction.

Even if the plaintiffs had properly objected to the evidence and the instruction to the jury, we believe this evidence was properly admitted into evidence and submitted to the jury. In Kansas, the admissibility of expert testimony is governed by K.S.A. 60-456(b), which states:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based

on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

The evidence clearly established that Dr. Shnider and Dr. Albright were experts in the field of anesthesiology. They testified as to their opinions based on facts and data perceived by them. The fact that their opinions were not as yet accepted by the majority of the medical community does not mean the jury should not have heard their opinions. The plaintiffs have cited no authority which would support such a "majority rule" approach.

Most of the cases on which plaintiffs rely deal with a different evidentiary issue than the one herein involved. Those cases deal with the admissibility of new scientific tests or techniques, rather than an opinion arrived at through accepted tests and techniques. In *Tice v. Richardson*, 7 Kan. App. 2d 509, 644 P.2d 490 (1982), the issue was whether human leucocyte antigen tests were a scientifically recognized method to prove paternity. The scientific recognition of tests or methods was also involved in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); *State v. Washington*, 229 Kan. 47, 622 P.2d 986 (1981); *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978); and *United States v. Brown*, 557 F.2d 541 (6th Cir. 1977). It is true that a new scientific procedure or test must have a certain degree of reliability before it may be offered as evidence to prove a proposition; however, in the instant case, the procedure involved (animal tests) is not at issue.

Plaintiffs cite two other cases which, although they do not deal with a test or procedure, are also distinguishable from the case at bar. In *Matter of Miller v. Nat. Cabinet Co.*, 8 N.Y.2d 277, 204 N.Y.S.2d 129, 168 N.E. 2d 811 (1960), the plaintiff sought to introduce testimony from a doctor of a possible connection between leukemia and exposure to a certain chemical. The expert doctor testified that he believed a person exposed to the chemical *might* develop leukemia. In reaching its decision of whether his testimony should have been admitted, the reviewing court stated:

"[The doctor] made crystal clear, however, that, when he used the word 'possible' in answering the hypothetical question, he meant that and nothing more. He demonstrated this beyond peradventure when he was asked on cross-examination what made him feel that this decedent's disease resulted from the

cause mentioned, by replying: 'I didn't say that. I was asked whether this could follow benzol. I didn't say *this particular man had it.*' . . . .

" . . . This admission by [the doctor] that he was not testifying whether the leukemia of this decedent was caused by exposure to benzol nullifies any inference that could possibly be drawn in favor of claimant. His testimony thus loses 'all probative force when supplemented and explained' by the testimony which he gave on cross-examination (citations omitted)." 8 N.Y.2d at 282-83.

Also, there was no statistical evidence offered in the *Miller* case to support a possible causal connection. For these reasons, the court found there was insufficient evidence to submit the issue of causation to the jury.

In the instant case, two acknowledged experts, Dr. Albright and Dr. Shnider, testified as to their belief in the cardiotoxic nature of Marcaine and listed experimental and statistical bases for their beliefs. Therefore, their testimony was not purely conjectural as was the testimony in *Miller.*

Also distinguishable is *Puhl v. Milwaukee Automobile Ins. Co.*, 8 Wis. 2d 343, 99 N.W.2d 163 (1959), where the plaintiff sought to prove that the Down's syndrome of a child was caused by a prenatal injury from an automobile accident. The doctor who testified was found by the court *not* to qualify as an expert on causes of the syndrome. 8 Wis. 2d at 351. The doctor did testify that he believed the accident caused the baby's defect, but in his explanation he relied on the authority of an expert in the study of Down's syndrome. In finding the doctor's testimony should not have been admitted, the court stated:

"True, *there is usually no requirement that before an expert may give an opinion he must demonstrate that most, or all, or many other experts would agree with his opinion.* However, the medical testimony given here is not of an expert in this field of medicine, and his opinion was based on the views of one authority out of several." (Emphasis added.) 8 Wis. 2d at 353.

In the case at bar, the defendants presented the two leading authorities on the study of Marcaine. Therefore, *Puhl* is clearly distinguishable.

In *State v. Churchill*, 231 Kan. 408, 413, 646 P. 2d 1049 (1982), this court stated:

"It is well established that the qualifications of expert witnesses and the admissibility of expert testimony are matters which lie within the sound discretion of the trial court; its rulings upon such testimony will not be disturbed on appeal, unless the appellate court finds an abuse of discretion."

There was no abuse of discretion in allowing testimony of the

cardiotoxic nature of Marcaine even though the theory was not as yet widely-accepted in the field. We note that along with the "cardiotoxic" testimony, the jury also heard testimony and opinions of other experts who disagreed with the validity of this theory. The fact that this theory was a minority view goes only to the weight the jury may give it, and not its admissibility.

Plaintiffs further assert that the fault of Breon should not have been determined by the jury. Because the jury was allowed to consider a possible defect in the drug - cardiotoxicity - as the cause of Mrs. Douglas' death, the court instructed the jury that it was to compare the fault of the drug's manufacturer, Breon.

The plaintiffs did not join Breon as a defendant in this action. Kansas law authorizes the comparison of the fault of a non-joined party under K.S.A. 60-258a. See *Brown v. Keill*, 224 Kan. 195, 206-07, 580 P.2d 867 (1978). Since the jury found Breon was not at fault, it is impossible to see how the plaintiffs were prejudiced by the consideration of Breon's fault. This court disregards alleged technical errors which do not affirmatively appear to have affected the rights of the complaining party. *Grubb, Administrator v. Grubb*, 208 Kan. 484, 491, 493 P.2d 189 (1972). Therefore, we find that it was not error to instruct the jury on comparing the fault of Breon.

Plaintiffs next contend the trial court erred by denying a new trial on the ground that the jury's verdict of "no fault" was against the weight of the evidence. The trial court's decision to deny a motion for new trial is discretionary and shall not be disturbed in the absence of an abuse of the exercise of the power of discretion. *Bott v. Wendler*, 203 Kan. 212, 229, 453 P.2d 100 (1969). An abuse of discretion exists only when no reasonable man would take the view adopted by the trial court. *Wilson v. American Fidelity Insurance Co.*, 229 Kan. 416, 422, 625 P.2d 1117 (1981).

When the verdict is attacked as contrary to the evidence, the reviewing court must determine only if the evidence, with all reasonable inferences to be drawn therefrom, when considered in a light most favorable to the successful party, will support the verdict. *Timsah v. General Motors Corp.*, 225 Kan. 305, Syl. ¶ 1, 591 P.2d 154 (1979). We find that it was reasonable for the trial court to have found there was substantial competent evidence to support the verdict, and, as such, there was no abuse of discre-

tion. We find persuasive the trial court's statement on this matter in its memorandum decision:

"In the instant case two acknowledged experts, Drs. Albright and Shnider, testified as to their belief in the cardiotoxic nature of Marcaine and listed the experimental and statistical bases for that belief. This belief was challenged by Dr. Abouleish and through the published opinions of other experts.

"We are not dealing in this situation with insubstantial claims based on relatively uninformed sources. Whether or not Dr. Albright will eventually be proven right or wrong is not for the determination of this Court. The science of medicine is a constantly changing one. The standards of practice of today vary significantly from those of a comparatively short time ago. The types of incidents we are dealing with in the instant case are infrequent ones which require a number of coincidental events to occur before there can be meaningful statements as to causality. As the Court understood the situation, every time a procedure of this type is attempted, there is a chance of one in one-to-two thousand that there will be an inadvertent intravascular injection of the drug, notwithstanding reasonable precautions being taken. Many times when there are inadvertent injections of these types, the patient survives. The theory has been that all patients should survive if proper resuscitative methods are used. Dr. Albright has stated that due to what he perceives as the cardiotoxic nature of Marcaine, some people, even if all proper resuscitative measures are taken, will not survive due to the basic effect of the drug, plus their individual susceptibilities to the drug and its effects.

"From a clinical standpoint it would be very difficult to separate out those cases where the deaths were due to physician negligence or error and the drug's lethal effects which overcome the resuscitative efforts. The sheep studies tended to show, at least in sheep, that Marcaine does have a cardiotoxic effect under certain conditions, sometimes fatally so. The significance of these tests was contested at trial, but the jury apparently found them to be convincing.

"The Court feels that what apparently was the verdict of the jury could have been reasonably deduced from the evidence. That conclusion was that, as the defendants' experts testified, Dr. Lombardino did what he was supposed to do, the hospital did what it was supposed to do, the physicians helping Dr. Lombardino did what they were supposed to do, and that the drug manufacturer had exercised all reasonable efforts to make a safe drug. It is significant to note that concern and evidence of Marcaine's dangerousness was not seriously raised in the medical community by Dr. Albright and Dr. Shnider until after this event occurred. The Court feels it was reasonable for the jury to find that this was a situation where science had not progressed to the point that those involved in the procedure in 1981 could reasonably have known that Mrs. Douglas was facing a greater danger than anyone anticipated."

". . . The Court feels that the experts and the evidence were sufficient to require the Court to submit it to the jury for consideration. To do otherwise, in the court's opinion, would have been to purposefully exclude what appeared to be probative evidence of the true cause of Mrs. Douglas' death. The jury could have decided that this conventional wisdom of the medical community was correct and the court would have sustained a verdict on that basis. However, the court views this as a jury question which should not be disturbed now."

Finally, the plaintiffs contend the trial court erred in denying a new trial based on newly discovered evidence. In this regard, plaintiffs claim that Dr. Lombardino's testimony at trial concerning the number of times he performed lumbar epidurals was contrary to his deposition. They also claim that new evidence will show that Dr. Lombardino left Suburban Medical Center because his work there was unsatisfactory. Finally, plaintiffs allege that newly discovered information suggests that the routine dosage of Marcaine used at Suburban Medical Center was higher than the dosage Dr. Lombardino testified was given and the plaintiffs speculate that the hospital records were altered prior to trial.

K.S.A. 60-259(a) lists five grounds for a new trial, including, "newly discovered evidence material for the party applying, which he could not, with reasonable diligence, have discovered and produced at the trial." In *Schraft v. Leis*, 236 Kan. 28, 686 P.2d 865 (1984), this court set out the rule for reviewing the trial court's decision of refusing to grant a new trial based on newly discovered evidence:

"The granting or denial of a new trial on grounds of surprise or newly discovered evidence is discretionary on the part of the trial court, and will not be reversed unless a clear abuse of discretion is shown. The burden is on the party seeking the new trial to show the new evidence could not with reasonable diligence have been produced at trial. Where the party does not meet this burden, a trial court does not abuse its discretion in refusing to consider the contents of a supporting affidavit which contains the new evidence." Syl.¶ 13.

With regard to the number of epidurals performed by Dr. Lombardino and his reason for leaving Surburban, the plaintiffs have not sustained their burden of showing that they could not have discovered this "new" information prior to trial.

In regard to plaintiffs' claim that the routine dose of Marcaine given at Suburban was higher than that claimed to have been given by Dr. Lombardino, the plaintiffs' counsel has submitted an affidavit stating that he was given this information by a witness who has since withdrawn the statement (refuses to give an affidavit). This court was presented with the same situation in *Sims v. Schrepel*, 208 Kan. 527, 492 P.2d 1312 (1972), where it was held that evidence in support of a motion for new trial sought on the basis of newly discovered evidence must be produced by the affidavit, deposition, or oral testimony of the witnesses themselves, and not of the attorney for the losing

party. This is in accordance with K.S.A. 60-259(g). The affidavit submitted by plaintiffs' counsel in this case is not in compliance with 60-259(g) and a new trial will not be granted on this ground.

The trial court's denial of the motion for new trial based on newly discovered evidence was proper and we uphold that decision.

The defendant, Humana, submitted a brief in which it argues that the trial court erred in submitting to the jury any question of the hospital's negligence and that the court erred in not directing a verdict in its favor on the issue of the agency relationship. These issues are apparently a cross-appeal by Humana. Since no notice of cross-appeal was filed, we have no jurisdiction to consider these matters. *Chetopa State Bancshares, Inc. v. Fox,* 6 Kan. App. 2d 326, 334, 628 P.2d 249 *rev. denied* 229 Kan. 669 (1981).

The judgment of the lower court is affirmed.