257 Kan. 420 (1995)
STATE OF KANSAS, Appellee,
v.
RANDY McIVER, Appellant.
No. 70,713
Supreme Court of Kansas.
Opinion filed April 21, 1995.
Jessica R. Kunen, chief appellate defender, argued the cause and was on the brief for appellant.
Ty Kaufman, county attorney, argued the cause, and Robert T. Stephan, attorney general, was with him on the brief for appellee.
The opinion of the court was delivered by
*421 LOCKETT, J.:
Randy M. McIver appeals his conviction of felony murder, a class A felony in violation of K.S.A. 1992 Supp. 21-3401. McIver was sentenced to life imprisonment. On appeal, the defendant claims that he was deprived of a fair trial because the district court failed to instruct the jury on his theory of defense of suicide and improperly admitted his incriminating statement. This court has jurisdiction pursuant to K.S.A. 1994 Supp. 22-3601(b)(1).
On July 27, 1992, Elmer Garner was found dead outside his mobile home in rural McPherson County. Garner, who was 84 years old and lived alone, had been shot once between his eyes with a small caliber weapon and was found with a white paper towel clutched in his right hand. A single .22 caliber shell casing was found in the vicinity of Garner's body, but no gun was found. Garner's rifle and wallet were missing. Although Garner never drank Budweiser beer, a half-empty Budweiser beer can was found on the ground outside the mobile home. The television was on and air conditioning was running inside the mobile home. Several pieces of correspondence soliciting Garner's membership in a right-to-die organization were in the home. No suicide note was found.
It had recently rained, and distinctive tire tracks in Garner's driveway led directly to the home of McIver, who knew Garner and lived approximately three miles away. Officers observed that McIver's pickup truck had tires that appeared to match the tracks left at the Garner residence.
Over the course of eight months after Garner's death, McIver and his wife were interviewed several times by law enforcement officers. McIver was interviewed by law enforcement officers on July 29, 1992; August 1, 1992; August 17, 1992; March 8, 1993; and April 8, 1993. McIver and his wife gave conflicting accounts of their activities and whereabouts on July 26, 1992. Each interview can be summarized as follows:
July 29, 1992
Two days after Garner's body was discovered, McIver and his wife were interviewed outside their residence for approximately *422 30 minutes. No Miranda warnings were given. Both McIver and his wife stated that they were at their home until around noon on July 26, 1992, and that they then visited their neighbor until 6:30 or 7:00 p.m. They denied going to Garner's residence, and the last time McIver said that he saw Garner was around June 2 or 3, 1992. McIver stated that he had no knowledge of Garner's death.
August 1, 1992
McIver was asked to come to the McPherson County Sheriff's office, where he was interviewed for approximately 45 minutes. No Miranda warnings were given. McIver admitted driving by Garner's residence sometime after 11:00 a.m. McIver stated that he did not see Garner at that point, so he drove on to his neighbor's house and stayed there until about 6:30 or 7:00 p.m. McIver said that some people were drinking Budweiser beer at the neighbor's residence, but that he did not drink any himself.
August 17, 1992
McIver voluntarily drove to Wichita to take a polygraph examination, at which he was given Miranda warnings. McIver's statement was basically the same as before except that he said that the last time he had seen Garner was in December or January. McIver stated that he did not know of anything that might be missing from the Garner residence.
March 8, 1993
McIver was interviewed at the McPherson County Sheriff's office, where he was given the Miranda warnings and signed a written waiver. McIver indicated that on the morning of July 26, his parents had visited his residence until approximately 11:00 a.m. McIver stated that he and his wife then ate lunch and drove to a neighbor's residence. McIver stated that on the way to the neighbor's residence, he stopped and visited with Garner for about 10 minutes about installing some pipes in the mobile home. McIver stated that when they left the Garner residence, Garner was alive. When they left the Garner residence, they drove out the secondary driveway past the old farmhouse and fuel tanks. McIver denied having any arguments with Garner or taking Garner's *423 billfold and rifle when he left the residence. McIver also denied having any beer to drink on that date. When confronted with the fact that Garner's billfold had been found on the township road about one-half mile south of the McIver residence, McIver denied any knowledge of the billfold.
McIver's wife, who was interviewed separately, stated that she and McIver drove over to their neighbor's residence, spending the day there and leaving at about 6:30-7:00 p.m. She stated that as they were going home, McIver mentioned something about installing some pipes at the Garner residence, so McIver decided to drive over and see about getting this done. McIver's wife stated she was very sure that it was near evening as the sun was setting and the sky was pink. While she never saw McIver actually talking to Garner, she stated that as far as she knew, Garner was alive when they left the residence. She stated that she had not heard any argument between Garner and McIver, and denied seeing a gun at the Garner residence. She could not remember McIver drinking any beer at that time.
April 8, 1993
McIver was scheduled to have a routine meeting that day with his parole officer. McIver and his wife were interviewed separately at the Rice County Sheriff's office. McIver was not given the Miranda warnings. McIver initially stated that he and his wife had gone to the neighbor's residence around noon. On their way to the neighbor's, McIver stated that they stopped at the Garner residence and he talked to Garner about installing the pipes. When asked whether he was drinking beer, McIver first denied it, but then said that he had been drinking a beer but had thrown it out on the way to the neighbor's house. McIver then admitted that he drove to Garner's residence between 6 and 7 p.m. on July 26; that when he arrived he found Garner dead, lying on his back; that he took Garner's wallet, and that he left the beer can in Garner's yard. McIver denied seeing a rifle at the scene. This initial interview lasted approximately 20 minutes.
McIver's wife was then interviewed. She recited nearly the same story that she had stated on March 8, only on this occasion *424 she said that when they got to the Garner residence, she saw McIver arguing with Garner. She said that Garner was alive, however, when they left. She stated that she also saw McIver throw something out the window, but she did not know what it was. When confronted with the fact that McIver had admitted taking the wallet, she then stated that when she and McIver first pulled up at Garner's, they observed him lying on the ground and already dead. She said that she saw McIver go to Garner, check to see if he had a pulse, and take Garner's wallet. McIver's wife indicated there was about $25 cash in the wallet. She stated that she also saw McIver grab a rifle and put it in the bed of the pickup, and that McIver planned to sell the gun because they needed the money. After they drove away, she observed McIver throw the wallet out of the pickup. She said that after they got home, McIver decided to get rid of the rifle.
After McIver's wife told officers about seeing the rifle at the scene, the officers interviewed McIver a second time. At some point in the interview officers showed McIver a report that falsely stated his fingerprints were found on the Budweiser beer can found at the deceased's home. McIver then admitted that he took Garner's rifle and that he had buried it in a hedge row behind his residence. This interview lasted approximately 15 minutes. During the course of the interviews, McIver was not handcuffed or restrained and was free to leave at any time.
McIver signed a consent to search and agreed to show officers where he had buried the rifle. McIver accompanied law enforcement officers in a police car to his home and dug up the rifle. McIver further agreed to accompany the officers to Garner's residence and retrace his tire tracks around the mobile home. During the drive back to the Rice County Sheriff's office, McIver admitted taking $5 from Garner's wallet. The officers told McIver they were going to talk to the county attorney. McIver was released. On April 9, 1993, McIver was charged with alternative counts of first-degree murder and felony murder. The shell casing found in the front yard was determined to have been fired from the rifle recovered at McIver's residence.
At trial the State proceeded on the theory that McIver killed Garner in the process of robbing Garner of his property. McIver's *425 defense was Garner was despondent and had committed suicide. Two witnesses testified they had visited Garner on the afternoon of July 26, 1992, to discuss religion. In the course of their conversation, Garner talked about some health problems he was having and mentioned that he intended to see a doctor the next day. Garner mentioned that he had known a person who committed suicide. The witnesses stated that Garner was friendly, did not appear to be despondent, and did not indicate he was contemplating suicide.
McIver's neighbor, who lived approximately three miles south on the same road as McIver, testified that McIver and his wife were at her house from around noon to approximately 6:30 p.m. Over the course of the afternoon, McIver consumed two or three cans of Budweiser beer and took another can with him when he and his wife left in his pickup truck.
Arlyn Tonn owned the McPherson County farm where Garner lived and was a witness for the State. Tonn testified although Garner was afraid of death, Tonn had not observed any behavioral changes in Garner in the months preceding his death, nor had Garner appeared to be despondent or depressed. Garner was right-handed. Garner's mobile home did not have operable indoor plumbing. Garner had an incontinence problem, and whenever Garner went outside to urinate, he took a white paper towel with him.
Tonn also owned the farmland on which McIver lived. McIver was often behind in making his rent payments. In lieu of paying rent, McIver was in the process of tearing down an old house near Garner's mobile home and was supposed to fix the plumbing in Garner's residence.
The pathologist who performed the autopsy on Garner placed the time of death at 11:00 a.m. on July 26, 1992. The bullet which entered Garner's skull traveled in a level, straight manner and did not exit the skull. Death was virtually instantaneous. Garner would not have had an opportunity to pick up the white paper towel in his hand after being shot, but that he may have had an opportunity to press it to his forehead by reflex action. In the pathologist's opinion, Garner's entrance wound was not a contact wound. Garner had been shot from no more than 6 inches away.
*426 The pathologist further testified that, because of the location of the wound, it was improbable that Garner had committed suicide with a rifle. His opinion was based upon the straight-in nature of the path of the bullet and the fact that it would be extremely difficult to aim a rifle in such a fashion at some distance from one's head and still reach the trigger mechanism. The pathologist further indicated that persons committing suicide generally use their dominant hand to pull the trigger mechanism, and the fact that Garner was clutching a paper towel in his right hand indicated that his death was not a suicide.
A KBI special agent who had investigated approximately 200 homicides and suicides testified that he had never seen a suicide committed by a gunshot wound between the eyes. He considered the white paper towel in the dominant hand of Garner to be very unusual for a gun suicide. The angle of the wound and the difficulty in anchoring the rifle to achieve this kind of wound weighed against suicide. When questioned about the differential in height between Garner, who was approximately six feet tall, and McIver, who was approximately five and one-half feet tall, and the angle of the bullet wound, the KBI agent advised that, based on his personal experience, when a gun is pointed at someone, they tend to look directly at the barrel. This would account for the front-to-back travel of the bullet regardless of the differential in height.
McIver's wife testified similarly to her prior statements to the officers.
McIver testified at trial that on July 26, 1992, he left his neighbor's residence at about 6:30 p.m. with a can of beer and arrived at the Garner residence between 6:30 and 7:00 p.m. After stopping the truck, he got out, carrying his half-full can of beer, and walked toward the Garner's mobile home.
McIver stated that he set the beer can down when he saw Garner lying in front of the mobile home. He walked about half the distance from the corner of the mobile home to Garner's body, a distance of approximately six feet and a place entirely out of his wife's eyesight as she sat in the pickup. McIver said that he could see blood on Garner's face, a rifle lying beside him, and *427 a wallet, but stated he did not walk close enough to see if Garner was dead.
McIver claimed that he returned to his pickup without checking whether Garner was dead. As he started to leave, he decided to get a closer look at Garner's body. McIver remembered pulling his pickup close to Garner's body, getting out, and checking to see if Garner was dead. He could not recall whether he checked Garner's pulse.
In spite of the fact that McIver knew he was on parole and could not possess firearms, he took the gun and Garner's wallet. McIver denied being in a hurry to leave the residence and could not explain the evidence of spinning tires as the truck left the property. As he was driving home he removed $5 from the wallet and then threw the wallet away. He never told his wife how much money was in the billfold.
When McIver was asked about the various interviews he had with the police, he admitted that he lied to hide the fact that he had been at Garner's residence on July 26. The only reason that he kept telling the police more and more about the events of July 26 was that his wife would tell the police things which caused him to reveal more. McIver admitted that he testified to facts at the trial that he had never told the police officers in any of the interviews. According to McIver, he buried the rifle because his fingerprints were on it, but never thought about his fingerprints on the billfold when he threw it out of the pickup. McIver denied that he stole the rifle and billfold because he wanted the money. McIver was convicted of felony murder.
Instruction on Suicide
During the conference on instructions for the jury, McIver claimed the prosecution must exclude the possibility of suicide and requested this instruction:
"Before considering the charge of murder in the first degree, you must first consider whether the evidence presented is sufficient to prove that the death of Elmer Garner was not the result of suicide. To reach this conclusion, you must find the facts presented are consistent with each other and conclusive so as to exclude suicide beyond all reasonable doubt."
The trial court refused to give the instruction, stating:

*428 "I am convinced that the principal instructions cover this. I tell the jury in their principal instructions that they must find beyond a reasonable doubt that the defendant killed Mr. Garner. And that by its very nature, by its very terms, is to the exclusion of suicide. And it simply isn't necessary to take all the potential theories in this case and tell the jury that the State must prove beyond a reasonable doubt that that particular theory didn't occur. There is also the chance, for instance, that someone else could have come in and committed this crime. I think the State has to prove that as well, that someone else didn't do it. But that's all wrapped up in not so much as them disproving that as much as it is that they are proving that the defendant killed Mr. Garner beyond a reasonable doubt. If they prove that to the satisfaction of the jury, that he killed Mr. Garner, that by its very finding is a finding that they're satisfied beyond a reasonable doubt that it wasn't suicide. I'm not going to in any way prevent you from arguing to the jury that the State has to prove that beyond a reasonable doubt. I think that's implicit in the principle instruction together with the burden of proof instruction. But I think at this point to give additional instructions on that, number one, isn't necessary, and number two, carries with it the potential to be confusing. I'm simply not going to give it."
The trial court instructed the jury that, in order to establish the crime of first-degree murder, the State must prove "[t]hat the defendant killed Elmer W. Garner." The trial court further instructed the jury that the State had the burden to prove McIver guilty, that McIver was not required to prove he was not guilty, and that the test was whether there remained a reasonable doubt as to the truth of the State's claims.
McIver claims that the trial court should have instructed the jury on the burden of proof for affirmative defenses in accordance with PIK Crim.3d 52.08, which states:
"The defendant claims as a defense that (here describe the defense claimed). Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant. If the defense asserted causes you to have a reasonable doubt as to the defendant's guilt, you must find the defendant not guilty."
McIver admits that the instruction requested by the defense at trial incorporated the wrong burden of proof, i.e., "beyond a reasonable doubt." McIver now asserts that the jury should have been instructed:
"The defendant claims as a defense that Mr. Elmer Garner committed suicide. Evidence in support of this claim should be considered by you in determining *429 whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant. If the defense asserted causes you to have a reasonable doubt as to the defendant's guilt, you should find the defendant not guilty."
McIver changes the focus of his argument and now argues the district court's failure to instruct the jury on suicide deprived him of a fair trial and due process of law as guaranteed by the Fourteenth Amendment. McIver points out that in U.S. v. Douglas, 818 F.2d 1317, 1320-21 (7th Cir.1987), the United States Court of Appeals stated that a defendant is entitled to a particular instruction on his theory of defense if he satisfies four requirements: (1) the theory proposes a correct statement of the law; (2) the theory is supported by the evidence; (3) the theory is not part of the charge; and (4) the failure to include an instruction on the defendant's theory of defense would deny the defendant a fair trial.
For authority requiring the giving of the instruction on the defense of suicide, McIver cites State v. Doyle, 201 Kan. 469, Syl. ¶ 4, 441 P.2d 846 (1968). In Doyle, the defendant's conviction for first-degree murder was set aside and the defendant discharged. The Doyle court found that the circumstances pointed no more strongly to criminal homicide than to death by suicide, accident, or natural causes and that it was not shown that the death did not result from suicide, accident, or natural causes. Doyle, 201 Kan. at 479. Doyle was found dead in his car with a single bullet wound in the right cheek and the gun under his hand. The court noted that "[w]here the circumstances are as consistent with the absence as well as the presence of crime, the corpus delicti has not been proved since the evidence is susceptible to a construction which will prove innocence as well as guilt." Doyle, 201 Kan. at 479. The court further noted that "[i]f the evidence is fairly susceptible to the construction that death was accidental, or the result of suicide, or due to natural cause, then it is not sufficient to warrant a conviction, for the reason that in order to convict a defendant he must be proven guilty of the crime charged beyond a reasonable doubt." Doyle, 201 Kan. at 479. The Doyle court stated in circumstantial cases, it is the duty *430 of the court to determine whether there is a basis in the evidence for a reasonable inference of the defendant's guilt. 201 Kan. 469, Syl. ¶ 6. It noted that this was a question of law for the judge to determine, not a question for the trier of fact. The rationale of Doyle was not that, under the circumstances, the jury should have been instructed that the State must overcome the inference of suicide; instead the Doyle court stated that as a matter of law the trial judge should not have allowed the jury to consider if the defendant was guilty and should have directed that the defendant be discharged.
In State v. Henderson, 226 Kan. 726, 732, 603 P.2d 613 (1979), the court observed that the rationale in Doyle that when the accused is charged with causing the death of the victim the possibility of death by suicide or natural causes must be excluded, had not been followed in our later cases. The Henderson court noted that the theory that the prosecution is under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt has been rejected by the United States Supreme Court. Jackson v. Virginia, 443 U.S. 307, 326, 61 L.Ed.2d 560, 99 S.Ct. 2781 (1979); Holland v. United States, 348 U.S. 121, 140, 99 L.Ed. 150, 75 S.Ct. 127 (1954).
The Henderson court observed that Doyle was a case where the prosecution presented an extremely weak circumstantial case for murder. It noted that in Doyle, the dead man was found seated behind the steering wheel of his car, with a single bullet wound in his right temple and a pistol lying beside his right hand on the seat of the car. There was no evidence that placed the defendant at the scene of the alleged crime. It noted that because the circumstantial evidence surrounding the death thus pointed no more strongly to criminal homicide than to death by accident or suicide, the trial judge improperly submitted the question of guilt to the jury. The Henderson court concluded that in cases where there was evidence placing the defendant in contact with the decedent or other evidence distinguishing the facts from Doyle, the prosecution was not under an affirmative duty to rule out every hypothesis of death and the question of guilt should be submitted to the jury.
*431 McIver states that although suicide is not an affirmative defense, under the facts of this case death by suicide must be excluded before the State may convict him of homicide. McIver's rationale is the jury should be instructed that when the defendant presents any theory of defense (suicide) that causes the jury to have a reasonable doubt as to the factual cause of death alleged by the prosecution, it should find the defendant not guilty.
In State v. Peters, 232 Kan. 519, 520, 656 P.2d 768 (1983), this court was confronted with a similar argument when the defendant objected to the judge giving an instruction on the defense of alibi. It noted that an alibi is not an affirmative defense. See PIK Crim.3d 52.19. The Peters court pointed out that an alibi is evidence showing that the defendant was not present at the time or place of the crime. The court said if an instruction is given, attention is called to the defendant's alibi, which connotes a burden not found in the law. 232 Kan. at 520. We have concluded in State v. Skinner, 210 Kan. 354, 361, 503 P.2d 168 (1972), that "the danger in instructing separately relative to the defense of alibi lies in the almost insurmountable difficulty of avoiding connotation of some burden on the accused to prove the defense."
We have noted that evidence merely tending to refute or deny one of the elements of the crime charged does not necessarily constitute an affirmative defense entitled to a separate instruction. State v. Davis, 236 Kan. 538, 542, 694 P.2d 418 (1985). This is true because when a defendant asserts an affirmative defense to the charge, it is assumed that facts alleged in the charging instrument are true, and if the affirmative defense is found to be factually true by the jury, the defendant should be found not guilty. Affirmative defenses to a crime charged are set out in the Kansas Criminal Code, K.S.A. 21-3101 et seq. PIK Crim.3d 52.08 sets out 38 separate instances where an instruction on affirmative defenses is required. Examples of an affirmative defense in PIK Crim.3d are: Ignorance or Mistake of Law, PIK Crim.3d 54.04; Intoxication-Involuntary, PIK Crim.3d 54.11; Compulsion, PIK Crim.3d 54.13; Entrapment, PIK Crim.3d 54.14; and Use of Force in Defense of a Person, PIK Crim.3d 54.17.
McIver's argument to expand the burden of proof of the State to first prove that the victim did not commit suicide is not persuasive. *432 Doyle does not support giving such an instruction. McIver fails to cite a state or federal case which supports the proposition that requires an instruction on the defense of suicide. See State v. Foster, 229 Kan. 362, 366, 623 P.2d 1360 (1981); State v. Knoxsah, 229 Kan. 36, 39, 622 P.2d 140 (1981); State v. Henderson, 226 Kan. 726, 732, 603 P.2d 613 (1979). Contrary to McIver's assertion, the principal instruction given on first-degree murder and the burden of proof adequately instructed the jury. If the jury concluded there was reasonable doubt as to McIver's guilt, for any reason, it was instructed to find McIver not guilty. The trial court correctly refused to instruct the jury that the State had to prove that the victim did not commit suicide.
Failure to Object
McIver and his wife were interviewed numerous times over the course of eight months. They embellished their statements during successive interviews and eventually revealed information implicating McIver. McIver argues for the first time on appeal that his implicatory statements during an interview with law enforcement officers on April 8, 1993, were inadmissible because: (1) it was a custodial interrogation and he was not given his Miranda warnings; and/or (2) the statements were involuntary. The State objects to this court's consideration of this issue because McIver did not object to the introduction of his statements at trial.
K.S.A. 60-404 states:
"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."
Prior to trial a hearing was conducted in accordance with Jackson v. Denno, 378 U.S. 368, 12 L.Ed.2d 908, 84 S.Ct. 1774 (1964), to determine if the defendants' statements to the officers were voluntary. The judge determined that McIver's statements were voluntary. Defense counsel did not file a motion to suppress McIver's statements or object to the introduction of the statements at trial. On appeal, McIver argues that because the judge *433 had found that the statements were voluntary, objecting to the admission of the statement at trial would serve no useful purpose. McIver asserts that even if an objection to the admission of the statements was required, this court should review the trial court's admission of the statements in the interests of justice because an officer used a falsified report which deceived McIver into believing his fingerprints were found on the beer can left at the scene of the crime.
The State cites to numerous cases supporting its position that McIver cannot raise the issue that the introduction of his statements was improper for the first time on appeal. See State v. Wilson, 247 Kan. 87, 98, 795 P.2d 336 (1990) (failure to object to witness' testimony at trial precludes raising issue on appeal); State v. Skelton, 247 Kan. 34, 48, 795 P.2d 349 (1990) (failure to object to the introduction of physical evidence at trial precludes raising issue on appeal); State v. Bishop, 240 Kan. 647, 659, 732 P.2d 765 (1987) (following K.S.A. 60-404, erroneous admission of witness' testimony held not to be reversible error where defendant failed to object at trial); Douglas v. Lombardino, 236 Kan. 471, Syl. ¶ 2, 693 P.2d 1138 (1985) (when a motion in limine is denied, the moving party must object to the evidence at trial to preserve the issue on appeal); State v. Chiles, 226 Kan. 140, 144, 595 P.2d 1130 (1979) (following K.S.A. 60-404, failure to object to photographic identification at trial precludes review on appeal).
Although ordinarily this court will not consider an issue which has not been raised in the trial court or which has not been raised by the parties on appeal, the court does have the power to do so in exceptional circumstances, where consideration of the new issue is necessary to serve the interests of justice or to prevent a denial of fundamental rights. See State v. Clemons, 251 Kan. 473, 483, 836 P.2d 1147 (1992) (whether defendant's Fourth Amendment rights were violated by admission of item seized in warrantless search considered despite defendant's failure to raise issue at trial); State v. Puckett, 230 Kan. 596, Syl. ¶ 1, 640 P.2d 1198 (1982) (Court of Appeals' sua sponte review of erroneous jury instructions upheld).
In this case, there is ample evidence to support the trial court's finding that the April 8 interview was not a custodial interrogation. *434 The evidence adduced at the Jackson v. Denno hearing indicates McIver was free to leave if he wished to do so and was not in custody. In addition, McIver had twice previously been given Miranda warnings.
Under the totality of the circumstances present here, it does not appear that the trial court's ruling was erroneous or that the new issue raised on appeal must necessarily be decided to serve the interests of justice or to prevent a denial of fundamental rights. When the unfavorable ruling on an evidentiary question prior to trial was received, McIver was required to make a timely objection to such evidence when introduced at trial in order to preserve the issue for appeal. See State v. Peckham, 255 Kan. 310, Syl. ¶ 7, 875 P.2d 257 (1994). No exceptional circumstances exist in this case.
Affirmed.